# EXHIBIT A

Thiago M. Coelho, SBN 324715
thiago@wilshirelawfirm.com
Robert J. Dart, SBN 264060
rdart@wilshirelawfirm.com
April Yang, SBN 330951
april@wilshirelawfirm.com
**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Boulevard, 12th Floor
Los Angeles, California 90010
Telephone: (213) 381-9988
Facsimile: (213) 381-9989

Assigned for All Purposes
Judge William Claster
CX-104

*Attorneys for Plaintiffs Jennifer Mullinix, Patrisia Vela,*
*Omar Orozco, and Proposed Class Counsel*

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| JENNIFER MULLINIX, PATRISIA VELA, AND OMAR OROZCO, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>US FERTILITY, LLC, a Delaware limited liability company; DOES 1 to 100, inclusive,<br><br>Defendants. | Case No.: 30-2021-01181929-CU-BC-CXC<br><br>**CLASS ACTION**<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Jennifer Mullinix, Patrisia Vela, and Omar Orozco ("Plaintiffs"), individually, and on behalf of all others similarly situated, bring this action based upon their personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigation of their attorneys.

### NATURE OF THE ACTION

1.     Defendant US Fertility, LLC ("Defendant" or "USF") is the largest physician-owned, physician-led partnership of top-tier fertility practices in the United States. USF was founded in early 2020 through a partnership between Amulet Capital Partners, LP, a middle-

**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

market private equity investment firm, and Shady Grove Fertility, the largest independent fertility practice in the United States.  Collectively, Defendant's network comprises 55 locations across 10 states and, through its clinics and staff of over 80 physicians, completed nearly 25,000 in vitro fertilization cycles in 2018.  USF's self-professed mission is "to drive innovation and leverage best practices both to enhance the patient experience and improve treatment outcomes."[1]  USF seeks to accomplish its mission statement through their collective clinical and operational expertise which provides their fertility partner practices with advanced business and digital solutions that streamline and enhance the delivery of exceptional patient care.  In this manner, affiliated practices gain access to best-in-class non-clinical, administrative, and technical platforms that streamline and simplify the delivery of fertility care.  However, the exact opposite result occurred when, as a result of Defendant's malfeasance, thousands of prospective patients and patients who received services from Defendant had their protected health information ("PHI") and private identifiable information ("PII") harvested by third-party actors with ill intentions. Defendant's patients reasonably expect the highest level of protection for their PII and PHI when giving Defendant this highly sensitive information, such as their names, addresses, dates of birth, MPI ("Master Patient Index") numbers, and social security numbers.  What USF customers did not expect, during the period between August 12, 2020 and September 14, 2020, was that their personal and sensitive information would be accessed and harvested by unauthorized third parties.

2.     Plaintiffs, individually, and on behalf of all similarly situated persons (hereafter, "Class Members"), bring this Class Action to secure redress against Defendant USF for its reckless and negligent violations of Plaintiffs' and Class Members' patient privacy rights. Plaintiffs and Class Members are individuals who were patients or prospective patients of USF during and preceding the period of August 12, 2020 to September 14, 2020.

3.     Plaintiffs and Class Members suffered significant injuries and damages.  Per the Defendant's data breach notice, the security breach compromised the PII—including names, addresses, dates of birth, MPI numbers, and social security numbers—of USF's patients. However, security experts say hackers could now wreak havoc in the lives of these patients, as

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

---

[1] https://www.usfertility.com/about-us-fertility/

the hackers had access to the patients' confidential medical and treatment histories, and test results.[2]

4.     As a result of Defendant's wrongful actions and inactions, unauthorized third parties gained access to and harvested Plaintiffs' and Class Members' PII.  Plaintiffs have been forced to take remedial steps to protect themselves from future loss.  Indeed, all Class Members are currently at a very high risk of identity theft and/or credit fraud, and prophylactic measures, such as the purchase of credit monitoring, are reasonable and necessary to prevent and mitigate future loss.

5.     Further, USF exacerbated the situation because USF did not alert its patients to the breach until, at the earliest, November 13, 2020, when it sent a letter notifying all affected patients of the data breach and their exposed PHI and PII, despite the fact that the breach began on August 12, 2020 and USF discovered the breach on September 14, 2020.  It remains unclear why it took Defendant two months' time after discovery of the breach and three months after the initial breach to notify its patients so that they could take steps to protect themselves and their sensitive information.  USF has also failed to specify how the attackers were able to infiltrate and access patients' PHI and PII, and USF even failed to provide its patients with complimentary credit monitoring services.  Instead, USF nonchalantly stated that it does not have evidence of actual misuse of any individual's information as a result of the data breach.  However, once PII has been accessed and harvested without authorization, the PII can be utilized through its sale to other bad actors long into the future.  Plaintiffs and Class Members will have to be ever watchful of their personal and financial accounts, spending large amounts of time, money, and effort to monitor for fraud, identity theft, and other misuse of their personal information.

**THE PARTIES**

6.     Plaintiff Jennifer Mullinix is a Maryland citizen residing in Sykesville, Maryland.  Plaintiff first gave her personal information to US Fertility in February 2017 at a Shady Grove Fertility clinic located in Columbia, Maryland.  She specifically recalls giving USF her Social Security number, date of birth, address and other contact information, as well has her personal

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12ᵗʰ Floor
Los Angeles, CA 90010-1137

---

[2] https://www.cybersecurity-insiders.com/ransomware-attack-leaks-patient-data-of-fertility-clinic/

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12ᵗʰ Floor
Los Angeles, CA 90010-1137

health information and medical history.  On November 25, 2020, Plaintiff received a letter from USF notifying her of a data breach that occurred in USF's computer network between August 12, 2020 and September 14, 2020.  Plaintiff was further informed by USF that Plaintiff's name, address, date of birth, and MPI number were included in the "impacted files when they were accessed without authorization."  On January 8, 2021, Plaintiff received another letter from USF notifying her that USF "recently received additional review results and determined the full scope of information potentially impacted in relation to [her]."  Plaintiff was informed that, in addition to Plaintiff's name, address, date of birth, and MPI number, Plaintiff's Social Security number and personal health information were also compromised as a result of USF's data breach.  Exposure of Plaintiff's PII and PHI as a result of the USF data breach has caused and placed her at imminent, immediate and continuing risk of financial harm and identity theft, as well as the misuse of her sensitive health information.

7.      Plaintiffs Patrisia Vela and Omar Orozco are California citizens residing in Norwalk, California.  Plaintiffs first gave their personal information to USF when they visited a Reproductive Partners clinic in Westminster, California on April 23, 2019.  On January 8, 2021, Plaintiffs each received a letter from USF notifying them of the data breach.  Plaintiff Vela's letter informed her that her name, Social Security number, and MPI number were compromised in the breach, as well as potentially her date of birth.  Plaintiff Orozco's letter informed him that his name, MPI number, and potentially his birth date were compromised in the breach.  As a result of receiving these letters and learning of USF's data breach, Plaintiffs took measures to freeze their credit card and financial accounts.  In addition, after Plaintiff Vela learned of the data breach, she began receiving phone calls and emails purporting to be from Chase bank and alerting her that there had been fraudulent activity in her bank account.  Plaintiff Vela is a customer of Chase and has active accounts with the bank, and she has begun spending significant time and energy monitoring her accounts out of fear.  On January 26, 2021, Plaintiff Vela received a phone from someone purporting to have "paperwork ready" for Plaintiff.  The caller knew Plaintiff's full name and was able to recite Plaintiff's Social Security number in its entirety.  When Plaintiff inquired about the caller's identity and the company from which he was calling, the caller

4

promptly ended the call.  Exposure of Plaintiffs' PII and PHI as a result of the USF data breach has caused and placed Plaintiffs at imminent, immediate and continuing risk of financial harm and identity theft, as well as the misuse of their sensitive health information.

8. Incorporated in 2018, Defendant US Fertility, LLC is a Delaware foreign limited liability company with its principal office located at 9600 Blackwell Road, Suite 500, Rockville, Maryland 20850. US Fertility is the "largest physician-owned and physician-led fertility management organization in the nation" and is a "partnership of top-tier fertility practices in the U.S." The partnership supports fertility practices with non-clinical services, including clinical and business information systems, facilities and operations management, finance and accounting, and fertility treatment financing programs. US Fertility's mission is to "drive innovation and leverage best practices" by providing "advanced business and digital solutions" that enhance patient care. Defendant has been registered with the California Secretary of State to practice business in the State of California since December 31, 2018.

9. Plaintiffs are unaware of the true names, identities, and capacities of the defendants sued herein as DOES 1 to 100. Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of DOES 1 to 100 if and when ascertained. Plaintiffs are informed and believe, and thereupon allege, that each of the defendants sued herein as a DOE is legally responsible in some manner for the events and happenings alleged herein and that each of the defendants sued herein as a DOE proximately caused injuries and damages to Plaintiffs and Class Members as set forth below.

10. As used herein, "Defendants" shall refer to US Fertility, LLC and Does 1 to 100, collectively.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to Section 410.10 of the California Code of Civil Procedure because Plaintiffs and Class Members are residents of California and Maryland, and because Defendant is incorporated in the State of Delaware.

12.      The Court has personal jurisdiction over Defendant because Plaintiffs' and Class Members' claims arise out of Defendant's business activities conducted in the State of California. Defendant has been registered with the California Secretary of State to practice business in the State of California since December 31, 2018.   Further, Plaintiffs suffered injuries resulting from Defendant's data breach and Defendant's violations of its contractual obligations in the State of California.

13.      Venue is appropriate in the County of Orange under Sections 395 and 395.5 of the California Code of Civil Procedure because, among other things: (a) Defendant contracted with Plaintiffs and Class Members to perform an obligation in the County of Orange; and (b) many of the acts and omissions, and the evidence thereof, that give rise to the claims for relief alleged in this action took place in the County of Orange.

14.      Venue is also proper in the County of Orange pursuant to California Code of Civil Procedure Section 395(a), as even if none of the Defendants can be said to reside in the State of California, the action may be tried in the superior court in any county that the Plaintiffs may designate in their complaint.

## FACTUAL ALLEGATIONS

### A. Defendant USF's Data Breach

15.      On or about November 13, 2020, USF sent a notice of data breach to its affected patients announcing that: "On September 14, 2020, USF experienced an IT security event (the "Incident") that involved the inaccessibility of certain computer systems on our network as a result of a malware infection . . . [W]e determined that data on a number of servers and workstations connected to our domain had been encrypted by ransomware . . . [C]onfirmed that the unauthorized actor acquired a limited number of files during the period of unauthorized access, which occurred between August 12, 2020 and September 14, 2020, when the ransomware was executed."   Further, pursuant to 45 C.F.R § 164.408, on or about November 25, 2020, USF reported a data breach to the Department of Health and Human Services, in which a hacking incident resulted in the breach of information from a network server.   The notice issued by USF also states that the information acquired by the hackers included "names, addresses, dates of birth,

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

MPI numbers, and social security numbers." Interestingly, USF listed having taken the following actions, which USF was already under a duty to implement, as discussed *infra,* only after the data breach occurred, in hopes of mitigating the risk of future data breaches: "(1) fortified the security of our firewall; (2) utilized the forensic specialists engaged to monitor network activity and remediate any suspicious activity; (3) provided notification to potentially impacted individuals as quickly as possible. We are also adapting our existing employee training protocols relating to data protection and security, including training targeted at recognizing phishing emails." However, noticeably absent from USF's data breach notice is an offer by Defendant to provide much-needed, complimentary credit monitoring services, as is customarily offered by companies that have suffered data breaches. Instead, Defendant merely encouraged its patients to review their own account statements, explanations of benefits, and credit reports carefully for unforeseen activity. Ironically, Defendant, who may have been the victim of a phishing attack itself and was admittedly inadequately prepared to detect and prevent such an attack, now passes the onerous job of monitoring their accounts for phishing attacks and other fraud unto its patients, which are damaged as a result of Defendant's recklessness. Notice of Data Breach attached hereto as **Exhibit A**.

Privacy Statement – US Fertility.pdf

16. USF promised its patients in its Privacy Policy that it "uses account information in a password-protected environment as a security measure to protect your data. We use administrative, physical, and technology safeguards to ensure confidentiality and integrity of data through audit controls, access controls, and data encryption. We also use industry standard SSL/TLS encryption to enhance security of electronic data transmissions." Further, USF also agreed that it would only share patients' PHI with authorized third parties "as permitted by law and as authorized by you." Privacy Policy attached hereto as **Exhibit B**.

**B. Defendant USF Had an Obligation to Protect Personal Information under Federal Law.**

17. Defendant USF is an entity covered by HIPAA (*see* 54 C.F.R. § 160.102) and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information").

18.      HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information." 45 C.F.R. § 164.502 (2009). HIPAA also requires that Defendant implement appropriate safeguards for this information. 45 C.F.R. § 164.530(c)(1) (2009). HIPAA additionally requires that Defendant provide notice of a breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable—i.e. non-encrypted data—to unauthorized third parties. 45 C.F.R. § 164.404 (2009); 45 C.F.R. § 164.402 (2009).

19.      Additionally, HIPAA requires that Defendant:

(a) Implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights, *see* 45 C.F.R. § 164.312(a)(1);

(b) Implement policies and procedures to prevent, detect, contain, and correct security violations, *see* 45 C.F.R. § 164.306(a)(1);

(c) Protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, *see* 45 C.F.R. § 164.306(a)(2);

(d) Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, *see* 45 C.F.R. § 164.306(a)(3);

(e) Ensure compliance with the HIPAA security standard rules by its workforce, *see* 45 C.F.R. § 164.306(a)(4); and

(f) Effectively train all members of its workforce on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health information.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

8

20. Defendant is prohibited by the Federal Trade Commission Act (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has found that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the Federal Trade Commission Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015).

### C. California Recognizes the Importance of PII

21. *California Civil Code* § 1798.81.5(a)(1) states that: "It is the intent of the Legislature to ensure that personal information about California residents is protected. To that end, the purpose of this section is to encourage businesses that own, license, or maintain personal information about Californians to provide reasonable security for that information."

### D. Stolen Information Is Valuable to Hackers and Thieves

22. It is well known, and the subject of many media reports, that PII is highly coveted and a frequent target of hackers. The issue of data security and threats thereto is well known. Despite well-publicized litigation and frequent public announcements of data breaches, Defendant maintained an insufficient and inadequate system to protect the PII of Plaintiff and Class Members.

23. Legitimate organizations and members of the criminal underground alike recognize the value of PII. Otherwise, they would not aggressively seek and pay for it. As previously seen in one of the world's largest data breaches, hackers compromised the card holder data of 40 million of Target's customers. *See* "Target: 40 million credit cards compromised," CNN Money, Dec. 19, 2013, *available at* http://money.cnn.com/2013/12/18/news/companies /target-credit-card/, attached hereto as **Exhibit C.** DataCoup is, in contrast, just one example of a legitimate business that pays users for personal information. *See* http://money.com/money/3001361/datacoup-facebook-personal-data-privacy/, attached hereto as **Exhibit D**.

24. PII is highly valuable to hackers. Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. PII that is

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

9

stolen from the point of sale are known as "dumps."  *See* Krebs on Security April 16, 2016, Blog Post, *available at* https://krebsonsecurity.com/2016/04/all-about-fraud-how-crooks-get-the-cvv/, attached hereto as **Exhibit E**.  PII can be used to clone a debit or credit card.  *Id.*

25.  Once someone buys PII, it is then used to gain access to different areas of the victim's digital life, including bank accounts, social media, and credit card details.  During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

26.  In addition to PII, a hacked email account can be very valuable to cyber criminals. Since most online accounts require an email address not only as a username, but also as a way to verify accounts and reset passwords, a hacked email account could open up a number of other accounts to an attacker.[3]

27.  As shown below, a hacked email account can be used to link to many other sources of information for an identity thief, including any purchase or account information found in the hacked email account.[4]



WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

---

[3] Identity Theft and the Value of Your Personal Data, Trend Micro (Apr. 30, 2015),
https://www.trendmicro.com/vinfo/us/security/news/online-privacy/identity-theft-and-the-value-of-your-personal-data.
[4] Brian Krebs, The Value of a Hacked Email Account, Krebs on Security (June 13, 2013, 3:14 PM),
https://krebsonsecurity.com/2013/06/the-value-of-a-hacked-email-account/.

COMPLAINT AND DEMAND FOR JURY TRIAL

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

28.     Hacked information can also enable thieves to obtain other personal information through "phishing."   According to the Report on Phishing available on the United States, Department of Justice's website: "AT&T, a large telecommunications company, had its sales system hacked into, resulting in stolen order information including full names and home addresses, order numbers and credit card numbers.  The hackers then sent each customer a highly personalized e-mail indicating that there had been a problem processing their order and re-directing them to a spoofed website where they were prompted to enter further information, including birthdates and Social Security numbers."[5]

29.     Health records are huge targets for fraudsters because they typically contain all of the information thieves would need to conduct mischief in the victim's name — from fraudulently opening new lines of credit to filing phony tax refund requests with the Internal Revenue Service. Indeed, these records are constantly sold on the dark web.[6]

## E.    The Data Breach Puts Plaintiffs and Class Members at Immediate and Continuing Risk of Identity Theft and Identity Fraud

30.     Defendant failed to abide by its own promise to implement and maintain reasonable security procedures and practices appropriate to protect the PHI and PII of Plaintiffs and Class Members.

31.     The ramifications of Defendant's failure to keep Plaintiffs' and Class Members' PII secure are gravely consequential.  According to Javelin Strategy and Research, "one in every three people who is notified of being a potential fraud victim becomes one . . . with 46% of consumers who had cards breached becoming fraud victims that same year."  "Someone Became an Identity Theft Victim Every 2 Seconds Last Year," Fox Business, Feb. 5, 2014 *available* at http://www.foxbusiness.com/personal-finance/2014/02/05/someone-became-identitytheft-victim-every-2-seconds-last-year.html, attached hereto as **Exhibit F**.

---

[5] https://www.justice.gov/archive/opa/docs/report_on_phishing.pdf
[6] Brian Krebs, Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm (Sept. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/#more-27860

32.     In the case of a data breach, simply reimbursing a consumer for a financial loss due to fraud does not make that individual whole again.  On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."  *See* "Victims of Identity Theft," U.S. Department of Justice, Dec 2013, *available* at https://www.bjs.gov/content/pub/pdf/vit12.pdf, attached hereto as **Exhibit G**.  In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims." *Id*. at 11.

33.     A person whose PII has been improperly obtained and compromised may not become aware of or experience the full extent of identity theft or fraud for years.  In addition, a victim may not easily detect fraudulent charges when the charges are nominal because typical fraud-prevention algorithms fail to capture such charges.  Those charges may be repeated, regularly skimming small amounts from a victim's account, without notice or detection for years, resulting in substantial total losses.

34.     The damage from PII exposure is particularly acute in the medical context.  A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.  *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010, 5:00 AM), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-citims/.  Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third saw their insurance premiums rise, and forty percent were never able to resolve their identity theft at all.  *Id*.

### F.   *Annual Monetary Losses from Identity Theft are in the Billions of Dollars*

35.     According to the BJS, an estimated 17.6 million people were victims of one or more incidents of identity theft in 2014.  As hackers and cybercriminal gangs have only become more sophisticated at gaining unauthorized access to sensitive information and evading detection as technology has generally advanced in the years since, it is not only probable, but almost certain

COMPLAINT AND DEMAND FOR JURY TRIAL

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

that even more people now fall victim to identity theft each year.  Among identity theft victims, existing bank or credit card accounts have been the most common types of stolen and misused information.  *Id*.

36.     Javelin Strategy and Research reports that losses from identity theft reached $21 billion in 2013.  *See* 2013 Identity Fraud Report, attached hereto as **Exhibit H**.  There may be a time lag between when harm occurs and when it is discovered, and between when PII is stolen and when it is used.  According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

See GAO, Report to Congressional Requesters, at 33 (June 2007), *available* at http://www.gao.gov/new.items/d07737.pdf.

37.     As a result of the data breach, Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are also subject to a higher risk of phishing and pharming where hackers exploit information they already obtained in an effort to procure even more PII.  Plaintiffs and Class Members are presently incurring and will continue to incur such damages in addition to any fraudulent credit and debit card charges incurred by them and the resulting loss of use of their credit and access to funds, whether or not such charges are ultimately reimbursed by the credit card companies.  In addition, Plaintiffs and Class Members now run the risk of unauthorized individuals creating credit cards in their names, taking out loans in their names, and engaging in other fraudulent conduct using their identities.

### G.   *Plaintiffs and Class Members Suffered Damages*

38.     The exposure of Plaintiffs' and Class Members' PII to unauthorized third-party hackers was a direct and proximate result of Defendant's failure to properly safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

their contracts with Plaintiffs and the Class Members, and state and federal law. The data breach was also a result of Defendant's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII in order to protect against reasonably foreseeable threats to the security or integrity of such information, also required by their contracts and state and federal law.

39.     Plaintiffs' and Class Members' PII is private and sensitive in nature and was inadequately protected by Defendant. Defendant did not obtain Plaintiffs' and Class Members' consent to disclose their PII, except to certain persons not relevant to this action, as required by applicable law and industry standards.

40.     As a direct and proximate result of Defendant's wrongful actions and inaction and the resulting data breach, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing risk of harm from identity theft and identity fraud, requiring them to take the time and effort to mitigate the actual and potential impact of the subject data breach on their lives by, among other things, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring their credit reports and accounts for unauthorized activity.

41.     Defendant's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs' and Class Members' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.     The improper disclosure, compromising, and theft of their PII;

b.     The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of unauthorized third-party hackers and misused;

c.     The untimely and inadequate notification of the data breach;

d.     Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach; and

COMPLAINT AND DEMAND FOR JURY TRIAL

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

e.   Ascertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market.

## CLASS ACTION ALLEGATIONS

42.   Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated pursuant to California Code of Civil Procedure § 382 and California Civil Code § 1781 (hereinafter, the "Class").  The Class is composed of:

> All persons residing in the State of California whose Personal Health Information and Personal Identifying Information was maintained by US Fertility, LLC and was compromised as a result of the breach announced by US Fertility, LLC on or about November 13, 2020 (the "California Class").

> All persons residing in the State of Maryland whose Personal Health Information and Personal Identifying Information was maintained by US Fertility, LLC and was compromised as a result of the breach announced by US Fertility, LLC on or about November 13, 2020 (the "Maryland Class").

> All persons residing Nationwide whose Personal Health Information and Personal Identifying Information was maintained by US Fertility, LLC and was compromised as a result of the breach announced by US Fertility, LLC on or about November 13, 2020 (the "Nationwide Class").

Excluded from the Class are: (a) Defendants, including any entity in which any of the Defendants has a controlling interest, is a parent or a subsidiary of, or which is controlled by any of the Defendants; (b) the officers, directors, and legal representatives of Defendants; and (c) the judge and the court personnel in this case as well as any members of their immediate families.  Plaintiff reserves the right to amend the definition of the Class if discovery, further investigation and/or rulings by the Court dictate that it should be modified.

43.   *Numerosity*.  The members of the Class are so numerous that the joinder of all Class Members is impractical.  While the exact number of Class Members is unknown to Plaintiffs at this time, given the fact that Defendant is the largest fertility management organization in the country, it stands to reason that the number of Class Members is at least in the thousands.  Class

COMPLAINT AND DEMAND FOR JURY TRIAL

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd. 12th Floor
Los Angeles, CA 90010-1137

Members are readily identifiable from information and records in Defendant's possession, custody, or control, such as account and payment information, as well as the notices sent.

44.    *Commonality and Predominance*.  There are questions of law and fact common to Class Members, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.  Whether Defendant owed a duty of care to Plaintiffs and Class Members with respect to the security of their PII;

    b.  What security measures must be implemented by Defendant to comply with its duty of care;

    c.  Whether Defendant met the duty of care owed to Plaintiffs and the Class Members with respect to the security of the PII;

    d.  Whether Defendant has a contractual obligation to Plaintiffs and Class Members to use reasonable security measures;

    e.  Whether Defendant has complied with any contractual obligation to use reasonable security measures;

    f.  Whether Defendant's acts and omissions described herein violated the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E.

    g.  Whether Defendant's acts and omissions described herein violated Regulation P, 12 C.F.R. § 1016.4;

    h.  What security measures, if any, must be implemented by Defendant to comply with its contractual obligations;

    i.  The nature of the relief, including equitable relief, to which Plaintiff and Class Members are entitled; and

    j.  Whether Plaintiffs and Class Members are entitled to damages, civil penalties, and/or injunctive relief.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

16

COMPLAINT AND DEMAND FOR JURY TRIAL

45.     *Typicality*.  Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PHI and PII, as with each of the other Class Members, was exposed and improperly disclosed by Defendant.

46.     *Adequacy of Representation*.  Plaintiffs will fairly and adequately represent and protect the interests of the Class Members.  Plaintiffs have retained competent counsel experienced in litigation of class actions, including consumer and data breach class actions, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs and Class Members have a unified and non-conflicting interest in pursuing the same claims and obtaining the same relief.  Therefore, all Class Members will be fairly and adequately represented by Plaintiffs and their counsel.

47.     *Superiority of Class Action*.  A class action is superior to other available methods for the fair and efficient adjudication of the claims alleged in this action.  The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims.  There will be no difficulty in the management of this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court.  Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied.

48.     Class certification is also appropriate because Defendant has acted or refused to act on grounds generally applicable to the Class Members, such that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

## FIRST CAUSE OF ACTION

(Breach of Express And/or Implied Contractual Promise)

49.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in paragraphs 1 through 48, inclusive, of this Complaint as if set forth fully herein.

50.     Defendant entered into an express contract with Plaintiffs and the Class Members. Defendant solicited and invited Plaintiffs and Class Members to become patients of USF, Plaintiffs and Class Members made offers to Defendant for services by seeking them out and

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

17

engaging them, and Defendant accepted Plaintiffs' and Class Members' offers by providing medical services.  Thus, Plaintiffs and Class Members either became patients of USF and entered into contracts for medical services with USF or gave their personal information to USF in anticipation of receiving medical services.

51.     USF's Privacy Statement, which USF has publicized on its website (https://www.usfertility.com/privacy-statement/), formed a part of its contract with Plaintiffs and Class Members.  Defendant represented, in the Privacy Statement, that it "uses account information in a password-protected environment as a security measure to protect your data. We use administrative, physical, and technology safeguards to ensure confidentiality and integrity of data through audit controls, access controls, and data encryption. We also use industry standard SSL/TLS encryption to enhance security of electronic data transmissions."  Accordingly, the Privacy Statement is contractually binding upon Defendant with regard to Plaintiffs and each of the Class Members.

52.     Further, the Privacy Statement also sets forth a limited set of third parties to whom PII can be disclosed, "as authorized by law and as authorized by you."

53.     The contractual duty to protect and safeguard Plaintiffs' and the Class Members' PII and PHI, which Defendant promised to undertake, was, even apart from the language of the Privacy Statement, a term of the contract by operation of law under the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E.  Under California law, all laws in place at the time a contract is entered which are relevant to the subject matter of that contract become binding terms of the contract.  *Akopyan v. Wells Fargo Home Mortg., Inc.*, 215 Cal. App. 4th 120, 135, 155 Cal. Rptr. 3d 245, 253 (2013) "[A]ll applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." ' [Citation.]") (quoting *Swenson v. File* (1970) 3 Cal.3d 389, 393, 90 Cal.Rptr. 580, 475 P.2d 852.).  Therefore, the HIPAA Privacy Rule and Security Rule also formed a contractual term in each of Defendant's contracts with Plaintiffs and the Class Members.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12ᵗʰ Floor
Los Angeles, CA 90010-1137

18

54.     Finally, the promise to safeguard and protect Plaintiffs' and the Class Members' PII and keep that PII from being accessed by third parties, was implied as a matter of law because Defendant, Plaintiffs, and the Class Members entered their agreements with the expectation and implied mutual understanding that Defendant would strictly maintain the confidentiality of the PII and safeguard it from theft or misuse.

55.     Therefore, Plaintiffs and Class Members became patients of USF pursuant to the mutually agreed-upon contracts with Defendant under which Defendant agreed to: (a) implement and maintain reasonable security procedures to protect Plaintiffs' and Class Members' personal information from unauthorized access, destruction, use, modification, or disclosure; and (b) prevent unauthorized third parties from obtaining access to Plaintiffs' and Class Members' PII.

56.     Plaintiffs and Class Members would not have provided and entrusted their PII to Defendant in the absence of the proper security safeguards and the promise to keep their PII safe.

57.     Plaintiffs and the Class Members performed all the contractual obligations by supplying their PII and paying for the services in question.  Any potential conditions required for Defendant's performance have occurred or were excused.

58.     Defendant breached the contractual promise that it made to Plaintiffs and Class Members by failing to: (a) implement and maintain reasonable security procedures to protect Plaintiffs' and Class Members' PII from unauthorized access, destruction, use, modification, or disclosure; and (b) prevent unauthorized third parties from obtaining access to Plaintiffs' and Class Members' PII.

59.     Plaintiffs and the Class Members were damaged.  Plaintiffs and the Class Members have been forced to spend considerable money, time, and effort to monitor their accounts for fraud.  Plaintiffs and the Class Members have also been deprived of the benefit of their bargain with Defendant by having their PII compromised and exposed and by being placed at an imminent, immediate and continuing risk of identity theft-related harm.  Plaintiffs' and the Class Members' contractual expectation was that their PII would be safeguarded and protected. Therefore, they paid more for Defendant's services than they would have paid had they known that their PII would not be protected.  Had Plaintiffs and the Class Members known that their PII

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

19

would not be protected, they would not have agreed to pay the price for which they contracted in exchange for the services. Plaintiffs and the Class Members also face a continuing and significant risk that their PII will be harvested and potentially sold on the dark web or otherwise misused, that they will lose money, and that their identities will be stolen as a result of the breach. These risks only increase as time passes and no action is taken. Finally, Plaintiffs and the Class Members have been deprived of the value of their PII, which has a considerable market value.

60.     Plaintiffs and the Class Members' losses were caused by Defendant's breach. By allowing the hackers to obtain the PII, Defendant caused Plaintiffs and the Class Members to independently obtain credit monitoring services, lose the benefit of their bargain, incur the risk of identity and property theft, and lose the value of their PII. Defendant directly caused each of these categories of damages because the hackers were able to infiltrate Defendant's systems and access Plaintiffs' and the Class Members' PII due to vulnerabilities that Defendant failed to either detect or rectify on its network, in violation of its own Privacy Policy and contractual obligations.

61.     Plaintiffs have suffered monetary injury in fact as a direct and proximate result of the acts committed by Defendant, as alleged herein, in an amount to be proven at trial, but in excess of the minimum jurisdictional amount of this Court.

## SECOND CAUSE OF ACTION

(Breach of Covenant of Good Faith and Fair Dealing)

62.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in paragraphs 1 through 61, inclusive, of this Complaint as if set forth fully herein.

63.     California law implies a covenant of good faith and fair dealing in every contract.

64.     Plaintiffs and Class Members contracted with Defendant for services by seeking them out and engaging them, effectively an offer, and Defendant accepted Plaintiffs' and Class Members' offers by providing medical services.

65.     Plaintiffs and Class Members performed all of their contractual duties under their agreements with Defendant.

66.     All of the conditions required for Defendant's performance under the contracts have occurred.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

67. Incorporated in the contracts as a matter of law was the covenant of good faith and fair dealing, which prevents a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement. The implied covenant imposes on a contracting party not only the duty to refrain from acting in a manner that frustrates performance of the contract, but also the duty to do everything that the contract presupposes that the contracting party will do to accomplish its purposes.

68. Here, the implied covenant of good faith and fair dealing required Defendant to safeguard and protect from disclosure to unauthorized third parties the PII of Plaintiffs and the Class Members, which Plaintiffs and Class Members shared with Defendant only for the purposes of procuring medical services for Plaintiff and the Class Members. Plaintiffs and the Class Members could not receive Defendant's services without submitting their PII and PHI to Defendant; thus, Defendant was obligated to implement reasonable measures to safeguard and protect the PII and PHI.

69. Defendant breached the covenant of good faith and fair dealing implied in its contracts with Plaintiffs and Class Members by engaging in the following conscious and deliberate acts: (a) failing to implement and maintain reasonable security measures to protect Plaintiffs' and Class Members' PII from unauthorized access, destruction, use, modification, or disclosure, as promised in its Privacy Statement; and (b) failing to ensure that unauthorized parties were not given access to Plaintiffs' and Class Members' PII. Defendant's failure to protect Plaintiffs' and the Class Members' PII frustrated Plaintiffs' and the Class Members' rights to the benefit of their bargains with Defendant to enjoy the commercial services offered by Defendant without incurring the grave risks of property and identity theft.

70. Plaintiffs and Class Members have been deprived of the benefit of their bargain with Defendant by having their PII compromised and have been placed at an imminent, immediate, and continuing risk of identity theft-related harm.

71. As a direct and proximate result of Defendant's breach of the covenant of good faith and fair dealing, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional

**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

21

requirement of this Court.

## **THIRD CAUSE OF ACTION**

(Negligence Per Se)

72.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in paragraphs 1 through 71, inclusive, of this Complaint as if set forth fully herein.

73.     Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

74.     Pursuant to HIPAA (42 U.S.C. § 1302d *et seq.*), Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' PHI and PII.

75.     Pursuant to Cal Civ. Code § 1798.81.5, Defendant had a duty to Plaintiffs and the Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and the Class Members' PII.

76.     Defendant breached its duties to Plaintiffs and the Class Members under the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d *et seq.*), and Cal Civ. Code § 1798.81.5 by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and the Class Members' PII.

77.     Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

78.     But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and the Class Members, Plaintiffs and the Class Members would not have been injured.

79.     The injury and harm suffered by Plaintiffs and the Class Members was the reasonably foreseeable result of Defendant's breach of its duties.  Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiffs and the Class Members to experience the foreseeable harm associated with the exposure of their PII.

80.     As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and the Class Members have suffered injury and are entitled to damages in an amount to be proven at

**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

COMPLAINT AND DEMAND FOR JURY TRIAL

trial.

## **FOURTH CAUSE OF ACTION**

### (Negligence)

81.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in paragraphs 1 through 80, inclusive, of this Complaint as if set forth fully herein.

82.     Defendant owed Plaintiffs and the Class Members, as its patients and customers, a duty of care in the handling of their PII and PHI.  This duty included, but was not limited to, keeping that PII secure and preventing disclosure of the PII to any unauthorized third parties. This duty of care existed independently of Defendant's contractual duties to Plaintiffs and the Class Members.   Under the California Consumer Privacy Act ("CCPA"), the Federal Trade Commission ("FTC") Guidelines, and other sources of industry-wide cybersecurity standards, Defendant is obligated to incorporate adequate measures to safeguard and protect PII that is entrusted to it in its ordinary course of business and transactions with customers.

83.     The CCPA imposes a duty on all entities conducting business in California to implement and maintain reasonable security procedures and practices appropriate to the nature of the information entrusted to them to protect customers' personal information.

84.     In 2016, the FTC updated its publication, "Protecting Personal Information: A Guide for Business," which establishes guidelines for fundamental data security principles and practices for business.[7]  Among other things, the guidelines dictate businesses should protect any personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.   The guidelines also recommend that businesses implement an intrusion detection system to expose breaches as soon as they occur; monitor all incoming traffic for activity indicating someone is attempting to infiltrate or hack the system; monitor instances when large amounts of data are transmitted to or

**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

---

[7] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personalinformation.pdf (last visited Nov. 22, 2019).

COMPLAINT AND DEMAND FOR JURY TRIAL

from the system; and have a response plan ready in the event of a breach.[8]  Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[9]

85.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the businesses' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.  Orders from these actions further clarify the measures businesses are required to undertake in order to satisfy their data security obligations.[10]

86.    Additional industry guidelines which provide a standard of care can be found in the National Institute of Standards and Technology's ("NIST's") Framework for Improving Critical Infrastructure Cybersecurity, *available at* https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04162018.pdf.  Among other guideposts, the NIST's framework identifies seven steps for establishing or improving a cybersecurity program (section 3.2).  Those steps are:

*Step 1: Prioritize and Scope*.  The organization identifies its business/mission objectives and high-level organizational priorities.  With this information, the organization makes strategic decisions regarding cybersecurity implementations and determines the scope of systems and assets that support the selected business line or process.  The Framework can be adapted to support the different business lines or processes within an organization, which may have different business needs and associated risk tolerance.  Risk tolerances may be reflected in a target Implementation Tier.

*Step 2: Orient*.  Once the scope of the cybersecurity program has been determined

---

[8] *Id.*
[9] Federal Trade Commission, *Start With Security: A Guide for Business* (Jun. 2015)
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[10] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases* https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-securityenforcement (last visited Nov. 22, 2019).

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

24

for the business line or process, the organization identifies related systems and assets, regulatory requirements, and overall risk approach.  The organization then consults sources to identify threats and vulnerabilities applicable to those systems and assets.

*Step 3: Create a Current Profile*.  The organization develops a Current Profile by indicating which Category and Subcategory outcomes from the Framework Core are currently being achieved.  If an outcome is partially achieved, noting this fact will help support subsequent steps by providing baseline information.

*Step 4: Conduct a Risk Assessment*.  This assessment could be guided by the organization's overall risk management process or previous risk assessment activities.  The organization analyzes the operational environment in order to discern the likelihood of a cybersecurity event and the impact that the event could have on the organization.  It is important that organizations identify emerging risks and use cyber threat information from internal and external sources to gain a better understanding of the likelihood and impact of cybersecurity events.

*Step 5: Create a Target Profile*.  The organization creates a Target Profile that focuses on the assessment of the Framework Categories and Subcategories describing the organization's desired cybersecurity outcomes.  Organizations also may develop their own additional Categories and Subcategories to account for unique organizational risks.  The organization may also consider influences and requirements of external stakeholders such as sector entities, customers, and business partners when creating a Target Profile.  The Target Profile should appropriately reflect criteria within the target Implementation Tier.

*Step 6: Determine, Analyze, and Prioritize Gaps*.  The organization compares the Current Profile and the Target Profile to determine gaps.  Next, it creates a prioritized action plan to address gaps – reflecting mission drivers, costs and benefits, and risks – to achieve the outcomes in the Target Profile.  The organization then determines resources, including funding and workforce,

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

necessary to address the gaps.  Using Profiles in this manner encourages the organization to make informed decisions about cybersecurity activities, supports risk management, and enables the organization to perform cost-effective, targeted improvements.

_Step 7: Implement Action Plan_.  The organization determines which actions to take to address the gaps, if any, identified in the previous step and then adjusts its current cybersecurity practices in order to achieve the Target Profile.  For further guidance, the Framework identifies example Informative References regarding the Categories and Subcategories, but organizations should determine which standards, guidelines, and practices, including those that are sector specific, work best for their needs.

87.     The PCI Data Security Standard ("DSS"), which includes a library of documents _available at_ https://www.pcisecuritystandards.org/document_library?category=educational_ resources&document=pci_dss_large_org, is also a source of duties of care applicable to Defendants.  The PCI DSS sets forth specific security standards applicable to all businesses which process major credit cards, like Defendants.  Included in the documents in the PCI DSS library is a document titled Best Practices for Maintaining PCI DSS Compliance, _available at_ https://www.pcisecuritystandards.org/documents/PCI_DSS_V2.0_Best_Practices_for_Maintaining_PCI_DSS_Compliance.pdf?agreement=true&time=1591897283857.   The entire document establishes a framework for obtaining and maintaining PCI DSS compliance, thereby establishing duties of care applicable to Defendant.

88.     In addition to the PCI DSS library of compliance documents, there is the Requirements and Security Assessment itself, https://www.pcisecuritystandards.org/documents/ PCI_DSS_v3-2-1.pdf?agreement=true&time=1591898978871,   which   sets   forth   specific requirements which a company must meet if it is to process major credit cards, as Defendant does.  This document establishes numerous detailed duties which applied to Defendant, including requirement 6.5.7, which concerns cross-site scripting:

_6.5.7_: Examine   software-development   policies   and   procedures   and   interview

26

responsible personnel to verify that XSS is addressed by coding techniques that include:

> • Validating all parameters before inclusion;

> • Utilizing context-sensitive escaping.

Other statutory duties can be found in California's Customer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification).

89.     In addition to their obligations under federal regulations and industry standards, Defendant owed a duty to Plaintiffs and the Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.  Defendant owed a duty to Plaintiffs and the Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the PII of Plaintiffs and the Class Members.

90.     Defendant owed a duty to Plaintiffs and the Class Members to design, maintain, and test its internal data systems to ensure that the PII in Defendant's possession was adequately secured and protected.

91.     Defendant owed a duty to Plaintiffs and the Class Members to create and implement reasonable data security practices and procedures to protect the PII in its possession, including adequately training its employees and others who accessed PII within its computer systems on how to adequately protect PII.

92.     Defendant owed a duty to Plaintiffs and the Class Members to implement processes or safeguards that would detect a breach of its data security systems in a timely manner.

93.     Defendant owed a duty to Plaintiffs and the Class Members to act upon data security warnings and alerts in a timely fashion.

94.     Defendant owed a duty to Plaintiffs and the Class Members to timely disclose if its computer systems and data security practices were inadequate to safeguard individuals' PII

from theft because such an inadequacy would be a material fact in customers' decisions to purchase products from Defendant or to entrust their PII to Defendant.

95.     Defendant owed a duty to Plaintiffs and the Class Members to disclose in a timely and accurate manner when data breaches occurred.

96.     Defendant owed a duty of care to Plaintiffs and the Class Members because they were foreseeable and probable victims of any inadequate data security practices and systems. Defendant collected PII from Plaintiffs and the Class Members directly.  Defendants knew that a breach of its data systems would cause Plaintiffs and the Class Members to incur damages.

97.     Defendant breached its duties of care to safeguard and protect the PII which Plaintiffs and the Class Members entrusted to it.  Defendants adopted inadequate safeguards to protect the PII and failed to adopt industry-wide standards set forth above in its supposed protection of the PII.  Defendant failed to design, maintain, and test its computer systems to ensure that the PII was adequately secured and protected, failed to create and implement reasonable data security practices and procedures, failed to implement processes that would detect a breach of its data security systems in a timely manner, failed to disclose the breach to potentially affected customers in a timely and comprehensive manner, and otherwise breached each of the above duties of care by implementing careless security procedures which led directly to the breach.

98.     Defendant breached the duties set forth in the CCPA, the FTC guidelines, California's Customer Records Act, Cal. Civ. Code §§ 1798.81.5, 1798.82, the NIST's Framework for Improving Critical Infrastructure Cybersecurity, and the PCI DSS.  In violation of the CCPA, Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information.  In violation of the FTC guidelines, *inter alia*, Defendant did not protect the personal customer information that it keeps; failed to properly dispose of personal information that was no longer needed; failed to encrypt information stored on computer networks; lacked the requisite understanding of their network's vulnerabilities; and failed to implement policies to correct security problems.  In violation of the NIST's Framework, Defendant, inter alia, failed to adopt sufficient resources to identity and address security gaps.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

COMPLAINT AND DEMAND FOR JURY TRIAL

99.     Finally, in violation of the California Customer Records Act, Defendant failed to employ reasonable security measures, and failed to timely notify Plaintiffs and the Class Members of the breach.

100.    As a direct and proximate result of Defendant's failure to adequately protect and safeguard the PII, Plaintiffs and the Class Members suffered damages.  Plaintiffs and the Class Members were damaged because their PII was accessed by unauthorized third-parties, resulting in increased risk of identity theft and theft of property for which Plaintiffs and the Class Members were forced to adopt preventive and remedial efforts.  Plaintiffs and the Class Members were also damaged in that they paid for services sold by Defendant in an amount that they would have refused to pay had they known that Defendant would not protect their PII as promised.  These damages were magnified by the passage of time because Defendant failed to notify its customers of the data breach until months had passed.  Plaintiffs and the Class Members were also damaged in that they are forced to expend money to purchase credit monitoring services, which they other would not have, if Defendant employed security measures commensurate with the sensitive nature of the information they collected.  In addition, Plaintiffs and the Class Members were also damaged in that they must now spend copious amounts of time combing through their records in order to ensure that they do not become the victims of fraud and/or identity theft.

101.    Plaintiffs have suffered monetary injury in fact as a direct and proximate result of the acts of negligence committed by Defendant, as alleged herein, in an amount to be proven at trial, but in excess of the minimum jurisdictional amount of this Court.

## FIFTH CAUSE OF ACTION

(Violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et. seq.*)

102.    Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 101, inclusive, of this Complaint as if set forth fully herein.

103.    By its actions and conduct as alleged herein, Defendant has committed one or more acts of unfair competition within the meaning of the UCL, Cal. Bus. & Prof. Code § 17200, that constitute unfair, unlawful and/or fraudulent business practices as those terms are defined under California law.

COMPLAINT AND DEMAND FOR JURY TRIAL

**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

104.     Defendant's business practices are unfair under the UCL because Defendant has acted in a manner that is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiffs and the Class Members.  The exposure of PII to unauthorized third-parties is substantially injurious because of the significant harm that can result to customers at the hands of those third-parties, and the protective measures that customers must undertake to protect themselves from the ramifications of this exposure of their data.  Further, the impact of Defendant's actions and/or inactions on Plaintiffs and Class Members far outweighs any possible justification or motive on the part of Defendant.  Plaintiffs and the Class Members could not reasonably have avoided these injuries because they relied upon Defendant's promises to protect and safeguard their PII from disclosure, as all consumers who require medical attention must.

105.     Defendant's failure to safeguard and protect Plaintiffs' and the Class Members' PII violates public policy as expressed in the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E, which provides that all medical providers must protect the sensitive medical information provided to them by their patients and may not disclose PII to any unauthorized third parties.  Defendant's failures and deficiencies also violate public policy as expressed in the Federal Trade Commission Act (15 U.S.C. § 45).    The Federal Trade Commission has found that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the Federal Trade Commission Act.  *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015).

106.     Defendant's failure to safeguard and protect Plaintiffs' and the Class Members' PII is violative of public policy as expressed in the CCPA, the FTC publications, including, Protecting Personal Information:    A Guide for Business, https://www.ftc.gov/system /files/documents/plain-language/pdf-0136_proteting-personalinformation.pdf (last visited Nov. 22, 2019), the NIST's Framework for Improving Critical Infrastructure Cybersecurity, and the PCI DSS.  These regulations and guidelines set forth a clear public policy that companies such as USF must take appropriate measures to prevent the exposure of customers' PII to hackers, measures which were evidently not taken by Defendant here.

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

COMPLAINT AND DEMAND FOR JURY TRIAL

107.    Defendant's business practices are also unfair because they significantly threaten or harm competition.  Participation in today's credit economy is predicated on the security of the PII of the participants in that economy, in the sense that PII is an asset of each individual which, if lost by him or her, jeopardizes his or her very ability to maintain capital.  Competitive economic activity cannot exist where PII goes unprotected and freely disseminated and/or exchanged by unauthorized third parties.

108.    Defendant's business practices are unlawful under the UCL because Defendant violated HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the FTCA, 15 U.S.C. § 45.

109.    Defendant violated HIPAA and the FTCA by: (a) failing to implement and maintain reasonable security procedures to protect Plaintiffs' and Class Members' PII from unauthorized access, destruction, use, modification, or disclosure; and (b) failing to ensure that unauthorized parties were not provided with access to Plaintiffs' and Class Members' PII.

110.    Defendant's business practices are also unlawful under the UCL because Defendant has violated the CCPA, the FTC Act, and California's Customer Records Act, Cal. Civ. Code §§ 1798.81.5 and 1798.82.  In violation of the CCPA, Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information.  Defendant's conduct also constituted an unfair or deceptive practice under the FTC Act because it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. 45(n).  Consumers cannot avoid the injuries themselves because they are not informed of the clandestine vulnerabilities of Defendant's network.  There is no reasonable benefit for consumers or competition from a vulnerable website, so the injury cannot be outweighed by any such countervailing benefit.  In violation of the Customer Records Act, Defendant failed to institute reasonable security measures, and failed to notify Plaintiffs and the Class Members of the breach in a timely manner.

111.    Defendant's business practices are also fraudulent under the UCL because they involved representations to the public which are likely to deceive the public.  Defendants sends

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

COMPLAINT AND DEMAND FOR JURY TRIAL

to its customers, and maintains publicly visible on its website, a Privacy Notice which states that Defendant "uses account information in a password-protected environment as a security measure to protect your data. We use administrative, physical, and technology safeguards to ensure confidentiality and integrity of data through audit controls, access controls, and data encryption. We also use industry standard SSL/TLS encryption to enhance security of electronic data transmissions" and, aside from the third parties specifically set forth in that Notice, promised not to disclose the PII to any other person or entity without the patients' express authorization. This Privacy Notice contains false statements, inasmuch as Defendant does not in fact "take appropriate steps to attempt to safeguard any medical or other personal information," and did in fact disclose the PII to unauthorized third parties.

112.   Defendant's representations are likely to deceive the public because they are untrue and because they indicate that Defendant will protect the PII of its customers from disclosure to unauthorized third parties, when in fact they will not do so. A reasonable consumer would believe that his or her PII will be protected by Defendant when that is not the case. Moreover, Plaintiffs and the Class Members relied on Defendant's representations in entering into contracts with Defendant for medical services, which they would not have entered had they known their PII would be unprotected.

113.   Plaintiffs and Class Members also suffered monetary injury because they did not receive the benefit of their bargains with Defendant, by which they agreed to pay for Defendant's services with the understanding that their payment information would be protected by Defendant. Plaintiffs and Class Members would not have paid the price they agreed to pay for Defendant's services if they had known that Defendant would not enact reasonable measures to protect their PII.

114.   Plaintiffs and Class Members also suffered monetary injury when they lost the value of their PII, which is a legitimate asset worth substantial money. Plaintiffs' and Class Members' PII, now that it has been exposed to hackers, is no longer worth the price that Plaintiffs and Class Members could have received for it on the dark web or other markets.

115.   Plaintiffs and Class Members have suffered monetary injury in fact as a direct and

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

proximate result of the acts of unfair competition committed by Defendant, as alleged herein, in an amount to be proven at trial, but in excess of the minimum jurisdictional amount of this Court.

## SIXTH CAUSE OF ACTION

(Violation of the Consumers Legal Remedies Act ("CLRA"), Cal Civ. Code § 1750 *et seq.*)

116.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in paragraphs 1 through 115, inclusive, of this Complaint as if set forth fully herein.

117.    Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in transactions with Plaintiffs and the Class Members which resulted in the sale of services by Defendant to Plaintiffs and the Class Members.

118.    Defendant engaged in the following unfair and deceptive acts and practices in the sale of these products:    (1) Representing that the services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; (2) Representing that the services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (3) Advertising services with intent not to sell them as advertised; (4) Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law.

119.    Plaintiffs and the Class Members relied on Defendant's material representations that their PII would be protected from disclosure to unauthorized third parties.

120.    As a result of Defendant's unfair and deceptive acts, Plaintiffs and the Class Members were harmed when their PII was unlawfully disclosed to unauthorized third parties without their consent.  Plaintiffs and the Class Members suffered risk of property and identity theft, and incurred costs to mitigate the harm resulting from those risks.

121.    Plaintiffs have suffered monetary injury in fact as a direct and proximate result of the acts of unfair competition committed by Defendant as alleged herein in an amount to be proven at trial but in excess of the minimum jurisdictional amount of this Court.

122.    Under the special notice requirement of the CLRA, Plaintiffs are required to provide Defendant with written notice at least 30 days prior to the commencement of an action for damages.  In satisfaction of this requirement, Plaintiffs will send written notice to Defendant

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12ᵗʰ Floor
Los Angeles, CA 90010-1137

33

1   via certified or registered mail contemporaneously with the filing of this Complaint.  Plaintiffs

2   will seek to amend the Complaint to seek relief once the requisite 30-day notice period has expired

3   and to state that Plaintiffs gave Defendant proper notice.  As further required by the CLRA,

4   concurrently with the filing of this Complaint, Plaintiffs will file an affidavit stating facts showing

5   that this action has been commenced in a county appropriate for the trial of the action.  A copy of

6   the letter is attached hereto as **Exhibit I**. A copy of the affidavit is attached hereto as **Exhibit J**.

7   <u>**SEVENTH CAUSE OF ACTION**</u>

8   (Violation of the California Consumer Privacy Act ("CCPA"),

9   Cal. Civ. Code § 1798.150 *et seq.*)

10   123.   Plaintiffs repeat and incorporate by reference each and every allegation contained

11   in paragraphs 1 through 122, inclusive, of this Complaint as if set forth fully herein.

12   124.   Under Cal. Civ. Code § 1798.150(a)(1), "Any consumer whose nonencrypted and

13   nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision

14   (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure

15   as a result of the business's violation of the duty to implement and maintain reasonable security

16   procedures and practices appropriate to the nature of the information to protect the personal

17   information may institute a civil action for any of the following:

18   (A) To recover damages in an amount not less than one hundred dollars ($100) and not

19   greater than seven hundred and fifty ($750) per consumer per incident or actual damages,

20   whichever is greater.

21   (B) Injunctive or declaratory relief.

22   (C) Any other relief the court deems proper."

23   125.   Plaintiffs and the Class Members provided to Defendant their nonencrypted and

24   nonredacted personal information as defined in § 1798.81.5 in the form of their PII.

25   126.   Plaintiffs' and the Class Members' PII was subject to unauthorized access and

26   exfiltration when it was exposed to and harvested by hackers.

27   127.   The unauthorized access, exfiltration, theft, and disclosure of Plaintiffs' and the

28   Class Members' PII was a result of Defendant's violation of its duty to implement and maintain

**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

34

COMPLAINT AND DEMAND FOR JURY TRIAL

reasonable security procedures and practices appropriate to the nature of the information to protect the personal information.

128.     Under Defendant's duty to protect customers' PII, it was required to implement reasonable security measures on all of their websites and computer networks to prevent and deter hacks.  That these vulnerabilities existed and enabled unauthorized third-parties to access and harvest customers' PII evidences that Defendant has breached that duty.

129.     Plaintiffs and Class Members have suffered monetary injury in fact as a direct and proximate result of the acts committed by Defendant, as alleged herein, in an amount to be proven at trial, but in excess of the minimum jurisdictional amount of this Court.

130.     Under the CCPA's "notice and cure" provision, Plaintiffs are required to provide Defendant with written notice at least 30 days prior to the commencement of an action identifying the specific provisions Plaintiffs allege have been or are being violated.  In satisfaction of this requirement, Plaintiffs will send written notice to Defendant via certified or registered mail contemporaneously with the filing of this Complaint.  Plaintiffs will seek to amend the Complaint to seek relief once the requisite 30-day notice period has expired and to state that Plaintiffs gave Defendant proper notice.  A copy of the letter is attached hereto as **Exhibit K.**

## SEVENTH CAUSE OF ACTION

(Violation of the Maryland Consumer Protection Act,

Md. Code Comm. Law, § 13-301 *et seq.)*

131.     Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 130, inclusive, of this Complaint as if set forth fully herein.

132.     Maryland Class Members are "consumers" as defined by Md. Code Ann., Com. Law § 13-101.

133.     Fertility clinic management services are "consumer services" as meant by Md. Code Ann., Com. Law § 13-101.

134.     The unlawful trade practices, misrepresentations, and omissions described herein did not constitute "professional services" on the part of Defendant.

135.     Defendant, through its clinics operating in Maryland, engaged in unlawful trade

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

35

practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the "consumer services" in violation of Md. Code Ann., Com. Law § 13-301, including but not limited to the following:

136.   Defendant misrepresented material facts pertaining to the sale of fertility clinic health services to the Maryland Class by representing that it would maintain adequate data privacy and security practices and procedures to safeguard Maryland Class Members' PII and PHI from unauthorized disclosure, release, data breaches, and theft in violation of Md. Code Ann., Com. Law § 13-301(1), (2)(i), (2)(iv), (3), (5)(i), (9)(i), (9)(iii), and 14(xxi);

137.   Defendant omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Maryland Class Members' PII and PHI in violation of Md. Code Ann., Com. Law § 13-301(1), (2)(i), (2)(iv), (3), (5)(i), (9)(i), (9)(iii), and 14(xxi);

138.   Defendant engaged in unfair acts and practices with respect to the sale of fertility clinic health services by failing to maintain the privacy and security of Maryland Class Members' PII and PHI, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the data breach. These unfair acts and practices violated duties imposed by laws including the 15 U.S.C. § 45; Md. Code Regs. 31.16.08.01, et seq.); and Md. Code Ann. Com. Law § 14-3503;

139.   Defendant engaged in unfair acts and practices with respect to the sale of fertility clinic health services by failing to disclose the data breach to Maryland Class Members in a timely and accurate manner, in violation of Md. Code Com. Law § 14-3504(b)(3);

140.   Defendant engaged in unfair acts and practices with respect to the sale of fertility clinic health services by failing to take proper action following the data breach to enact adequate privacy and security measures and protect Maryland Class Members' PII and PHI from further unauthorized disclosure, release, data breaches, and theft.

141.   The above unfair and deceptive practices and acts by Defendant were unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

COMPLAINT AND DEMAND FOR JURY TRIAL

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

142.     Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard Maryland Class Members' PII and PHI and that risk of a data breach or theft was highly likely.  Defendant's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Maryland Class.

143.     As a direct and proximate result of Defendant's unlawful practices, Maryland Class Members suffered injury and/or damages.

144.     Maryland Class Members seek relief under Md. Code Ann., Com. Law § 13-408, including, but not limited to, damages, injunctive relief, and attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION

(Violation of the Maryland Personal Information Protection Act,

Md. Code Ann., § 14-3501 *et seq.)*

145.     Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 144, inclusive, of this Complaint as if set forth fully herein.

146.     Under the Maryland Personal Information Protection Act ("PIPA"), a business that owns or licenses personal information of an individual residing in the State of Maryland shall implement and maintain reasonable security procedures and practices that are appropriate to the nature of the personal information owned or licensed and the nature and size of the business and its operations.

147.     Personal information means an individual's first name or first initial and last name in combination with a social security number, driver's license number, or financial account number, including a credit card number or debit card number that, in combination with any required security code, access code or password, would permit access to an individual's financial account.

148.     Defendant's actions as set forth herein violate PIPA in that Defendant has failed to implement and maintain reasonable and appropriate security procedures and practices to protect Maryland Class Members' PII and PHI.

149.     A violation of PIPA is an unfair or deceptive trade practice and subject to

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010-1137

enforcement under the Maryland Consumer Protection Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief as follows:

1.      For compensatory damages in an amount according to proof at trial;

2.      For restitutionary damages in an amount according to proof at trial;

3.      For affirmative injunctive relief mandating that Defendant implement and maintain reasonable security procedures and practices to protect Plaintiffs' and Class Members' PII and PHI from unauthorized access, destruction, use, modification, or disclosure;

4.      To appoint Plaintiffs' counsel class counsel and Plaintiffs class representatives;

5.      To certify the class requested herein;

6.      For costs of suit and litigation expenses;

7.      For attorneys' fees under the common fund doctrine and all other applicable law; and

8.      For such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury trial for all claims so triable.

Dated: February 1, 2021                              Respectfully submitted,


                                                     /s/ *Thiago M. Coelho*
                                                     Thiago M. Coelho
                                                     Robert Dart
                                                     April Yang
                                                     **WILSHIRE LAW FIRM**

                                                     *Attorneys for Plaintiffs Jennifer*
                                                     *Mullinix, Patrisia Vela, and Omar*
                                                     *Orozco and the Proposed Class*

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

38

# Exhibit A

**US Fertility Provides Notice of Data Security Incident**

US Fertility ("USF") is providing notice of a recent incident that may affect the security of certain individuals' protected health information. USF provides IT platforms and services to several infertility clinics, including Georgia Reproductive Specialists, LLC d/b/a SGF Atlanta, Center for Reproductive Endocrinology, Center for Reproductive Medicine & Advanced Reproductive Technologies, Center for Reproductive Medicine Alabama, Center for Reproductive Medicine Orlando, Coastal Fertility Specialists, Fertility Centers of Illinois, LLC, Fertility Partners of Pennsylvania Surgery Center, LLC, Idaho Center for Reproductive Medicine, Nevada Center for Reproductive Medicine, Nevada Fertility Center, New York Fertility Medical Practice, PLLC d/b/a SGF New York, Northwest Center for Infertility and Reproductive Endocrinology, LLP d/b/a IVF Florida Reproductive Associates, Reproductive Endocrinology Associates of Charlotte, Reproductive Partners Fertility Center - San Diego, Reproductive Partners Medical Group, Inc., Reproductive Science Center of the San Francisco Bay Area, Seattle Reproductive Medicine, SGF Tampa Bay, LLC, Shady Grove Fertility Center of Pennsylvania, PLLC, Shady Grove Reproductive Science Center, P.C., Sher Institute of Reproductive Medicine New York, Sher Institute of Reproductive Medicine St. Louis, UNC Fertility, Utah Fertility Center, Virginia Fertility Associates, LLC d/b/a SGF Richmond, and Virginia IVF and Andrology Center, LLC.

On September 14, 2020, USF experienced an IT security event (the "Incident") that involved the inaccessibility of certain computer systems on our network as a result of a malware infection. We responded to the Incident immediately and retained third-party computer forensic specialists to assist in our investigation. Through our immediate investigation and response, we determined that data on a number of servers and workstations connected to our domain had been encrypted by ransomware. We proactively removed a number of systems from our network upon discovering the Incident. With the assistance of our third-party computer forensic specialists, we remediated the malware identified, ensured the security of our environment, and reconnected systems on September 20, 2020. We also notified federal law enforcement authorities of the Incident and continue to cooperate with their investigation. The forensic investigation is now concluded and confirmed that the unauthorized actor acquired a limited number of files during the period of unauthorized access, which occurred between August 12, 2020 and September 14, 2020, when the ransomware was executed.

We have been working diligently with a specialized team of third-party data auditors to perform a comprehensive review of all information contained in the files accessed without authorization as a result of the Incident. The purpose of this review was to accurately identify any individuals whose personal information may have been present within the impacted files and therefore accessible to the unauthorized actor.

On November 13, 2020, we began receiving the results of this review and determined that the following information relating to certain individuals was included in the impacted files when they were accessed without authorization: names, addresses, dates of birth, MPI numbers, and Social Security numbers. **The types of information impacted vary by individual, and we determined that for many individuals, Social Security numbers were not impacted**. Please also note that we have no evidence of actual misuse of any individual's information as a result of the Incident.

In response to the Incident, USF has taken the following actions to mitigate any risk of compromise to information involved and to better prevent a similar event from recurring: (1) fortified the security of our firewall; (2) utilized the forensic specialists engaged to monitor network activity and remediate any suspicious activity; (3) provided notification to potentially impacted individuals as quickly as possible. We are also adapting our existing employee training protocols relating to data protection and security, including training targeted at recognizing phishing emails. We believe these steps will be effective in mitigating any potential harm to individuals. As always, we encourage individuals to review account statements, explanations of benefits, and credit reports carefully for unexpected activity and to report any questionable activity to the associated institutions immediately.

We sincerely apologize that this Incident occurred and remain committed to safeguarding the privacy and security of the information entrusted to us. We have established a dedicated call center for individuals to contact with questions or concerns. If you have any questions regarding this Incident that are not addressed in this notice, please contact our assistance line, which can be reached at 855-914-4699 (toll free), Monday through Friday from 9:00 am to 9:00 pm EST, excluding U.S. holidays.

As indicated above, we have no evidence of actual misuse of any individual's information as a result of this Incident. Included are proactive steps that can be taken to safeguard one's personal information in response to *any* data security event:

## Monitor Accounts

Under U.S. law, you are entitled to one free credit report annually from each of the three major credit reporting bureaus.  To order your free credit report, visit www.annualcreditreport.com or call, toll-free, 1-877-322-8228.  You may also contact the three major credit bureaus directly to request a free copy of your credit report.

You also have the right to place a "security freeze" on your credit report, which will prohibit a consumer reporting agency from releasing information in your credit report without your express authorization.  The security freeze is designed to prevent credit, loans, and services from being approved in your name without your consent.  However, you should be aware that using a security freeze to take control over who gets access to the personal and financial information in your credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application you make regarding a new loan, credit, mortgage, or any other account involving the extension of credit.  Pursuant to federal law, you cannot be charged to place or lift a security freeze on your credit report.  Should you wish to place a security freeze, please contact the major consumer reporting agencies listed below:

| **Experian** | **TransUnion** | **Equifax** |
|---|---|---|
| PO Box 9554 | P.O. Box 160 | PO Box 105788 |
| Allen, TX 75013 | Woodlyn, PA 19094 | Atlanta, GA 30348-5788 |
| 1-888-397-3742 | 1-888-909-8872 | 1-800-685-1111 |
| www.experian.com/freeze/center.html | www.transunion.com/credit-freeze | www.equifax.com/personal/credit-report-services |

In order to request a security freeze, you will need to provide the following information:

1. Your full name (including middle initial as well as Jr., Sr., II, III, etc.);
2. Social Security number;
3. Date of birth;
4. If you have moved in the past five (5) years, provide the addresses where you have lived over the prior five years;
5. Proof of current address, such as a current utility bill or telephone bill;
6. A legible photocopy of a government-issued identification card (state driver's license or ID card, military identification, etc.); and
7. If you are a victim of identity theft, include a copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft.

As an alternative to a security freeze, you have the right to place an initial or extended "fraud alert" on your file at no cost.  An initial fraud alert is a 1-year alert that is placed on a consumer's credit file.  Upon seeing a fraud alert display on a consumer's credit file, a business is required to take steps to verify the consumer's identity before extending new credit.  If you are a victim of identity theft, you are entitled to an extended fraud alert, which is a fraud alert lasting seven years.  Should you wish to place a fraud alert, please contact any one of the agencies listed below:

| **Experian** | **TransUnion** | **Equifax** |
|---|---|---|
| P.O. Box 9554 | P.O. Box 2000 | P.O. Box 105069 |
| Allen, TX 75013 | Chester, PA 19016 | Atlanta, GA 30348 |
| 1-888-397-3742 | 1-800-680-7289 | 1-888-766-0008 |
| www.experian.com/fraud/center.html | www.transunion.com/fraud-victim-resource/place-fraud-alert | www.equifax.com/personal/credit-report-services |

**<u>Additional Information</u>**

You can further educate yourself regarding fraud alerts, security freezes, and the steps you can take to protect yourself and prevent identity theft by contacting the consumer reporting agencies, the Federal Trade Commission, or your state Attorney General.

The Federal Trade Commission can be reached at: 600 Pennsylvania Avenue NW, Washington, DC 20580, www.identitytheft.gov, 1-877-ID-THEFT (1-877-438-4338); TTY: 1-866-653-4261. The Federal Trade Commission also encourages those who discover that their information has been misused to file a complaint with them. You can obtain further information on how to file such a complaint by way of the contact information listed above. You have the right to file a police report if you ever experience identity theft or fraud.  Please note that in order to file a report with

law enforcement for identity theft, you will likely need to provide some proof that you have been a victim. Instances of known or suspected identity theft should also be reported to law enforcement and your state Attorney General. This notice has not been delayed by law enforcement.

**California Residents:** Visit the California Office of Privacy Protection (www.oag.ca.gov/privacy) for additional information on protection against identity theft. **Kentucky Residents:** Office of the Attorney General of Kentucky, 700 Capitol Avenue, Suite 118 Frankfort, Kentucky 40601**,** www.ag.ky.gov, Telephone: 1-502-696-5300. **Maryland Residents:** Office of the Attorney General of Maryland**,** Consumer Protection Division 200 St. Paul Place Baltimore, MD 21202**,** www.oag.state.md.us/Consumer, Telephone: 1-888-743-0023. **New Mexico Residents**: You have rights pursuant to the Fair Credit Reporting Act, such as the right to be told if information in your credit file has been used against you, the right to know what is in your credit file, the right to ask for your credit score, and the right to dispute incomplete or inaccurate information. Further, pursuant to the Fair Credit Reporting Act, the consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information; consumer reporting agencies may not report outdated negative information; access to your file is limited; you must give your consent for credit reports to be provided to employers; you may limit "prescreened" offers of credit and insurance you get based on information in your credit report; and you may seek damages from a violator. You may have additional rights under the Fair Credit Reporting Act not summarized here. Identity theft victims and active duty military personnel have specific additional rights pursuant to the Fair Credit Reporting Act. You can review your rights pursuant to the Fair Credit Reporting Act by visiting www.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf, or by writing Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave. N.W., Washington, D.C. 20580. **New York Residents:** the Attorney General may be contacted at: Office of the Attorney General, The Capitol, Albany, NY 12224-0341; 1-800-771-7755; https://ag.ny.gov/. **North Carolina Residents:** Office of the Attorney General of North Carolina**,** Consumer Protection Division, 9001 Mail Service Center Raleigh, NC 27699-9001, www.ncdoj.gov, Telephone: 1-919-716-6400, 877-566-7226 (toll free within NC). **Oregon Residents:** Oregon Department of Justice, 1162 Court Street NE, Salem, OR 97301-4096, www.doj.state.or.us/, Telephone: 877-877-9392. **Rhode Island Residents:** Office of the Attorney General, 150 South Main Street, Providence, Rhode Island 02903, www.riag.ri.gov, Telephone: 401-274-4400. Under Rhode Island law, you have the right to obtain any police report filed in regard to this incident. There is one (1) Rhode Island residents impacted by this incident. **Washington D.C. Residents:** the Office of Attorney General for the District of Columbia can be reached at: 441 4thStreet NW, Suite 1100 South, Washington, D.C. 20001; 1-202-442-9828; https://oag.dc.gov. **All US Residents:** Identity Theft Clearinghouse, Federal Trade Commission, 600 Pennsylvania Avenue, NW Washington, DC 20580, www.consumer.gov/idtheft, 1-877-IDTHEFT (438-4338), TTY: 1-866-653-4261.

Exhibit B

 

# Privacy Statement

US Fertility ("we, "us", or "our") operates the USFertility.com webs
Policy describes how we collect and use personal information about
well as your choices about how personal information will be used. B
privacy practices contained in this Privacy Policy. We encourage yo
to understand our privacy practices before using the Site or submit

## Scope

US Fertility provides non-clinical, administrative and business supp
infertility clinics ("Network Practices"). This Privacy Policy applies
not include any associated subdomains. The Network Practices, US
other third parties have their own subdomains, websites and privac
subject to this Privacy Policy. We encourage you to read the privacy
to understand their privacy practices and your options.

## Information Collection

When you visit the Site, we collect the following personal informati

- Contact information, such as your name, address, email, telepho
  name.
- Unique identifiers and preference information such as your inter
  browser type, and your navigation and clickstream behavior fron
  website.

US Fertility collects this information ourselves and share it as neede
their performance of contracted services for us. We may also collec
user experience monitoring and improvement, and related busines
information that we collect.

You may be asked to submit personal information if you register for
content, or make similar requests. Examples of free content include
blogs, and white papers. We use this information to contact you abo
with requested content.

If you submit any personal information that is not your own, you rep
authority to do so and to permit us to use that information in accor
you contact us with a question, comment, or complaint, we may co
information (such as your email or mailing address) in order for us
may also keep a record of the correspondence in order to assist you

## Tracking Technologies

We use various technologies to collect personal information about
most websites, these technologies include the following:

- **Web Logging.** US Fertility maintains web logs to record data abo
  and we will store this information. This information may include I
  internet service provider, referring/exit pages, operating system
  clickstream data. All web logs are stored securely and are access
  employees and contractors as required. Those with access to thi
  regarding user data security and privacy.
- **Cookies and other tracking technologies. US Fertility uses techno
  and scripts.** These technologies are used in analyzing trends, ren
  administering the Site, tracking users' movements around the Si
  information about our user base as a whole. In doing this, we ma
  domain name of the user, your internet service provider, your op
  and time of access. A cookie is a small piece of information, whic
  stored on your computer or other device. Cookies do not damag

browser to notify you when you receive a cookie. This will enable
accept it or not. If you do not accept cookies, you may not be able
browser software or this Site. We may obtain the services of outs
collecting and processing information collected through cookies
control or delete cookies, we recommend you visit www.aboutco
guidance.

- **Do Not Track (DNT).** DNT is a privacy preference that users can s
  to collect information about their online activity. However, there
  standard for sending and receiving DNT signals. Due to this lack
  impossible for us to promise that we comply with all known and u
  Therefore, we do not respond to DNT signals or other mechanism
  regarding the collection of personal information about activities
  websites. If a universal standard for DNT becomes available, we n

## Submit, Access, Adjust, or Remove Your Informatio

If you would like to access, correct, amend, remove, obtain a copy,
information about you that has been collected and stored by US Fer
contact information provided below so that we may respond to you
your request at our earliest convenience and in compliance with ap

We may need to retain certain information for recordkeeping comp
that you began prior to requesting such access, change or deletion
personal information for the period necessary to fulfill the purpose
unless a longer retention period is required or permitted by law.

You have the ability to opt in to receiving messages from US Fertilit
marketing or market research information, or to adjust your specifi

To opt in to emails, adjust your email and data preferences, or to o
email Beth Holder (Beth.Holder@USFertility.com).

By actively opting in to emails from US Fertility, you agree that your
processing including updating your record to reflect your affirmativ
tracking within those emails such as when you open them and whe
data to determine which content resonates with you to personalize
Fertility and for other marketing purposes, such as determining yo
If you do not want to have your data processed in this manner, you
Fertility or you can abstain from opting in to communications. We i
email preference or opt out on all marketing communications.

## Sharing of Information

US Fertility shares personal information with third parties as permi
you as described in the Terms of Use, this Privacy Policy, or otherwi
information with third parties that provide services to help us with
responding to your requests for more information. These third part
personal information about you only as necessary to provide these
parties may be required to disclose information, as described in the
"Disclosures in Accordance with Law."

## HIPAA

As a Business Associate of the Network Practices, which are Covere
Insurance Portability and Accountability Act and its implementing r
Health Information Technology for Economic and Clinical Health (H
"HIPAA"), US Fertility maintains protected health information in con
contractual obligations to the Network Practices.

Under HIPAA, each Covered Entity is required to provide or make av
Practices ("NPP"), depending on your interaction with the Covered
by law, an NPP will be provided to you or made available to you by th
completely separate from, and not related to, the practices describ

## Security of Information Collected

US Fertility uses account information in a password-protected envi
to protect your data. We use administrative, physical, and technolo
confidentiality and integrity of data through audit controls, access
We also use industry standard SSL/TLS encryption to enhance secu
transmissions.

## Disclosures In Accordance With Law

US Fertility discloses personal information about you as s necessary
civil, criminal, or regulatory investigation. We fully cooperate with l
identifying illegal activities and may, in our sole discretion, disclose
information to satisfy any law, regulation, subpoena, or governmen
to release personal information or other information about users w
illegal activities or are otherwise in violation of our Terms of Use, ev
or court order, if we believe, in our sole discretion, that such disclos
to operate our Site or to protect our rights or property, or that of o
directors, employees, agents, third-party content providers, suppli
also reserve the right to report to law enforcement agencies any ac
our sole discretion to be unlawful. If we are legally compelled to dis
third party, we will attempt to notify you by sending an email to the
unless doing so would violate the law or unless you have not provide

**California Residents** If you are a California resident, you have the fol

- The right to request, up to 2 times in a 12-month period, that we
  categories of personal information we have collected, disclosed
  months, (2) the categories of sources from which the personal i
  business purpose for which we use this information, and (4) the
  whom we share or have shared your personal information in the
- The right to request, up to 2 times in a 12-month period, that we
  the specific pieces of personal information we have collected ab
- The right to request, up to 2 times in a 12-month period, that we
  that we collected from you, subject to certain exceptions;
- The right to opt-out of the sale of your personal information to th
- The right to designate an authorized agent to submit one of the
- The right to not be discriminated against in receiving different o
  or financial incentive for exercising any of the above rights.

## Minors

Our Services are not intended or designed to attract children unde
the age of 18, you must not provide your personal information. We
personal information from any person under the age of 18.

## Changes to this Privacy Policy

We may amend this Privacy Policy from time to time. If we make an
we collect, use or disclose your personal information, we will notify
announcement on our website.

## Applicable Laws

US Fertility is headquartered in the United States of America and o
visitors who are located in the United States. Our collection and us
subject to applicable United States privacy laws.

## Contact Information

If you have questions or concerns about this Privacy Policy, our info
any other aspect of privacy and security of your personal informatic
email address of security officer]. You may also write to us at:

US Fertility

Privacy Statement - US Fertility

ATTN: Security Officer
9600 Blackwell Rd., Suite 500, Rockville, MD 20850.

**EFFECTIVE DATE (LAST UPDATED ON):** JULY 15, 2020

## Join Our Network

With the support of US Fertility, physicians are able to lev
experience and be relieved of their non-clinical, administ
and instead focus on providing optimal patient care.

Learn More



**PHYSICIANS**

Practice Success

Refer a Patient

Partnership Opportunities

Join Our Network

**PATIENTS**

Financial Options

Find a Location

Contact Us

**ABOUT US FERTILITY**

Contact Us

Leadership

Copyright © 2020 US Fertility   |   Terms & Conditions   |   Privacy Statement

Exhibit C



Markets  Tech  Media  Success  Perspectives  Video

# Target: 40 million credit cards compromised

by CNNMoney Staff   @CNNMoney

December 19, 2013: 4:41 PM ET

Hacking your credit card as you shop

A breach of credit and debit card data at discount retailer Target may have affected as many as 40 million shoppers who went to the store in the three weeks after Thanksgiving, the retailer said Thursday.

Late Wednesday, the Secret Service, which is charged with safeguarding the nation's financial infrastructure and payment systems, confirmed it was investigating the breach.

Spokesman Brian Leary declined further comment.

The breach first came to light via a report from respected security researcher Brian Krebs, who said Target had suffered a data breach around the time of Black Friday last month "potentially involving millions of customer credit and debit card records."

Target (TGT), the nation's No. 2 general merchandise retailer after Wal-Mart Stores (WMT), said cards used at the brick-and-mortar stores between Nov. 27 and Dec. 15, 2013, may have been impacted.

**Related: 4 things to do after your card has been hacked**

Target didn't specify how its systems were hacked. But judging by the scope of the breach and the kind of information criminals got, security experts say hackers targeted the retailer's point-of-sale system. That means they either slipped malware into the terminals where customers swipe their credit cards, or they collected customer data while it was on route from Target to its credit card processors.

The retailer said it notified authorities and financial institutions immediately after it was made aware of the unauthorized access, and had hired a forensics team to thoroughly investigate how the breach may have happened. The issue that allowed the breach has been identified and resolved, according to Target spokeswoman Molly Snyder.

Personal Finance

Paid Content                    by Outbrain |


California Program Pays Off Your Home If You Have No Missed Payments (You Must...
www.the-finance-news.com

Doctor Warns: Carbs Are Likely Not The Problem (This is)
Active PK


The Marijuana Stock You've Been Looking For
thetradingletter.com


The Best Dressed Couples At The 2019 Met Gala
Livingly

CNNMoney Sponsors

SmartAsset                    Paid Partner

These are your 3 financial advisors near you

This site finds and compares 3 financial advisors in your area

Check this off your list before retirement: talk to an advisor

Answer these questions to find the right financial advisor for you

Find CFPs in your area in 5 minutes

NextAdvisor                    Paid Partner

An Insane Card Offering 0% Interest Until Nearly 2020

"Target's first priority is preserving the trust of our guests and we have moved swiftly to address this issue, so guests can shop with confidence," CEO Gregg Steinhafel said in a statement. "We regret any inconvenience this may cause."

The thieves reportedly gained access to data on the magnetic strips of shoppers' cards, potentially allowing them to produce counterfeit versions, according to Krebs.

The thieves could also potentially withdraw cash from ATMs using counterfeit debit cards if they were able to intercept PIN data from Target, he said.

Many major credit card companies and banks -- including American Express (AXP), Discover (DFS), Bank of America (BAC), Chase (JPM), Wells Fargo (WFC) and PNC -- said they were monitoring the situation, and encouraged customers to alert them to any possible fraudulent charges. In data breach situations, customers aren't on the hook for any fraudulent charges. Someone further up the chain -- the card issuer, or sometimes the merchant -- is responsible for those costs.

Visa (V) and Citigroup (C) did not respond to requests for comment, and HSBC declined to comment.

Transferring Your Balance to a 14-Month 0% APR is Ingenious

The Top 7 Balance Transfer Credit Cards On The Market Today

Get $300 Back With This Outrageous New Credit Card

How hackers can turn out your lights

Target competitor TJX Companies (TJX) -- which operates discount retail chains T.J. Maxx and Marshalls -- fell victim to one of the worst security breaches ever back in 2006, when hackers gained access to at least 94 million domestic and international accounts containing credit card, debit card, and check information.

*CNNMoney's Greg Wallace, Julianne Pepitone, James O'Toole, Chris Isidore and Jose Pagliery, and CNN's Joe Johns contributed to this report.*

CNNMoney (New York)
First published December 18, 2013: 7:54 PM ET

PAID CONTENT                                                                                              |

Exhibit D

# Money

## Forget Facebook, Meet The Company That Will Pay You For Your Personal Data



Looking Glass—Getty Images

By **JACOB DAVIDSON** September 4, 2014

Matt Hogan wants to give you $10 a month in exchange for all of your personal data. Your Facebook likes. Your tweets. Your instagrams. Even your spending history. Everything about you, in other words, that's digitally accessible.

Whether or not that sounds like a fair exchange, Hogan's offer is better than zero, which is what we generally get paid for our data now — and that's the reason many consumers just might be intrigued. After all, with Facebook, Google, and other companies making money off of every search-engine query and social media post they can get their hands on, isn't it about time the people who generate all their data get a cut of the revenue it generates?

"There's no other asset class [other than personal data] where the chief stakeholder has zero rights at the negotiating table," Hogan argues.

That's set to change if DataCoup, Hogan's nascent "personal data marketplace," succeeds. After a months-long beta, and a waiting list of over 10,000

prospective users, the finished product is set to be released to the public on Thursday. The free platform connects to a multitude of data sources, from social networks to bank accounts. DataCoup customers can then learn about the information they've connected through data visualizations, choose which data to sell, and to whom they wish to sell it.

The company says it will pay users based on what information they provide, with a maximum of $10 a month to start. As of now, DataCoup has no buyers for its data and is paying for user information out of pocket. However, Hogan says multiple parties have expressed interest in partnering with DataCoup if the platform is a success. He anticipates the price of personal data increasing as more companies become buyers, with compensation coming in the form of both cash and various coupons and discounts.

**A Viable Business Model?**

DataCoup didn't exactly invent the idea of DIY data sales. Jaron Lanier, author of *Who Owns the Future?* has long argued that users of services like Google and Facebook should not only be monetarily compensated for their data but for the content they post as well. After all, there would be no Twitter without our tweets.

Hogan isn't even the first person to try building a company around this concept. Various entrepreneurs, going back about a decade, have tried to let consumers take control of and sell their online information. In 2005, for example, an entrepreneur named Seth Goldstein penned a sort of privacy manifesto—"A Declaration of Gestural Independence"—that outlined four basic rights for the so-called attention market: the right to own your data, move your data, see how the data is being used, and to be paid for whatever information you choose to release. At the same time, he and a few like-minded technologists founded AttentionTrust.org with the hopes of achieving his treatise's goals.

Out of this project came Root Vault, a browser extension that recorded its user's browsing habits, ready to be sold if its owner so desired. Goldstein was never able to build a large enough user base to create a sustainable business, however, and his major data customers—mortgage brokers looking for potential leads—were destroyed by the housing crisis. Eventually, both RootVault and AttentionTrust shut down.

---

LIVE POLL   2 450 VOTES

**Will wind energy ever be as efficient as fossil fuels?**



Today, Goldstein realizes most people prefer convenience to privacy. RootVault "was trying to create a solution to a problem that people didn't feel acutely," Goldstein told MONEY. "People don't feel viscerally the issue of their data being exposed and monetized without their direct knowledge." Even with new technology that makes sharing your data with a broker easier than ever, he thinks selling one's own information remains a hassle that's not worth the modest monetary reward.

One reason that reward is so modest is that companies own large portions of your data already. Columbia Business School professor Oded Netzer doesn't doubt the value of the average consumer's internet activity, but wonders if businesses don't already have all the information they need. "The question is whether there is still value for additional data that can be sold," notes Netzer.

Despite the naysayers, DataCoup remains unfazed. In order to make its value clearer, the company has put together a video series with experts from different fields describing alternatively utopian and dystopian visions of how the personal data economy might work in 2016. The upshot: Unless consumers take control of their data, both business and average Joes will suffer. "We're really focused on educating people on why their data is so important," explains Hogan.

The DataCoup founder agrees past attempts have failed, but thinks Edward Snowden's disclosures, which revealed extensive NSA surveillance, have changed how consumers think about privacy. "Snowden opened up the psyche of consumers and made them realize they're giving away data every time they do anything," said Hogan. "Sometimes they get enough stuff in return, and sometimes they don't."

Exhibit E

Advertisement



# Krebs on Security

## In-depth security news and investigation



About the Author
Advertising/Speaking

26
Apr 16

### All About Fraud: How Crooks Get the CVV

A longtime reader recently asked: "How do online fraudsters get the 3-digit card verification value (CVV or CVV2) code printed on the back of customer cards if merchants are forbidden from storing this information? The answer: If not via phishing, probably by installing a Web-based keylogger at an online merchant so that all data that customers submit to the site is copied and sent to the attacker's server.

**Kenneth Labelle,** a regional director at insurer **Burns-Wilcox.com**, wrote:

> "So, I am trying to figure out how card not present transactions are possible after a breach due to the CVV. If the card information was stolen via the point-of-sale system then the hacker should not have access to the CVV because its not on the magnetic strip. So how in the world are they committing card not present fraud when they don't have the CVV number? I don't understand how that is possible with the CVV code being used in online transactions."

First off, "dumps" — or credit and debit card accounts that are stolen from hacked point of sale systems via skimmers or malware on cash register systems — retail for about $20 apiece on average in the cybercrime underground. Each dump can be used to fabricate a new physical clone of the original card, and thieves typically use these counterfeits to buy goods from big box retailers that they can easily resell, or to extract cash at ATMs.

However, when cyber crooks wish to defraud online stores, they don't use dumps. That's mainly because online merchants typically require the CVV, criminal dumps sellers don't bundle CVVs with their dumps.

Instead, online fraudsters turn to "CVV shops," shadowy cybercrime stores that sell packages of cardholder data, including customer name, full card number, expiration, CVV2 and ZIP code. These CVV bundles are far cheaper than dumps — typically between $2-$5 apiece — in part because the are useful mainly just for online transactions, but probably also because overall they more complicated to "cash out" or make money from them.



The vast majority of the time, this CVV data has been stolen by Web-based keyloggers. This is a relatively uncomplicated program that behaves much like a banking Trojan does on an infected PC, except it's designed to steal data from Web server applications.

PC Trojans like ZeuS, for example, siphon information using two major techniques: snarfing passwords stored in the browser, and conducting "form grabbing" — capturing any data entered into a form field in the browser before it can be encrypted in the Web session and sent to whatever site the victim is visiting.

Web-based keyloggers also can do form grabbing, ripping out form data submitted by visitors — including names, addresses, phone numbers, credit card numbers and card verification code — as customers are submitting the data during the online checkout process.

These attacks drive home one immutable point about malware's role in subverting secure connections: Whether resident on a Web server or on an end-user computer, if either endpoint is compromised, it's 'game over' for the security of that Web session. With PC banking trojans, it's all about surveillance on the client side pre-encryption, whereas what the bad guys are doing with these Web site attacks involves sucking down customer data post- or pre-encryption (depending on whether the data was incoming or outgoing).

If you're responsible for maintaining or securing Web sites, it might be a good idea to get involved in one or more local groups that seek to help administrators. Professional and semi-professionals are welcome at local chapter meetings of OWASP, CitySec, ISSA or Security Bsides meetups.



Tags: bsides, Burns-Wilcox, citysec, cvv, cvv2, dumps, issa, Kenneth Labelle, owaps, web-based keyloggers, zeus

This entry was posted on Tuesday, April 26th, 2016 at 2:56 pm and is filed under A Little Sunshine, Web Fraud 2.0. You can follow any comments to this entry through the RSS 2.0 feed. Both comments and pings are currently closed.

## 53 comments

1.  *Bruce Hobbs*
   April 26, 2016 at 5:33 pm

   I use IBM's Trusteer Endpoint Protection (Rapport) which is supposed to block these key loggers either on my computer or on the server I'm connecting to. My understanding is that they encrypt the keystrokes before the SSL encryption and the encryption continues on the server after the SSL encryption has been removed. I have no idea if it works except I have no problems with online transaction fraud (which really doesn't prove that it works).

   ◦ *Bruce Hobbs*
     April 26, 2016 at 5:36 pm

     Brian, you wrote about Rapport back on April 29, 2010. Since then, IBM has bought them.

     http://krebsonsecurity.com/2010/04/a-closer-look-at-rapport-from-trusteer/

2.  *zboot*
   April 26, 2016 at 5:38 pm

Exhibit F

# Someone Became an Identity Theft Victim Every 2 Seconds Last Year

article

Data breaches have been dominating headlines recently--and with good reason.

Continue Reading Below

A new identity fraud victim was hit every two seconds in America in 2013, with the number of victims climbing to 13.1 million over the year, according to Javelin Strategy & Research's 2014 Identity Fraud Study. This is an uptick of more than 500,000 victims in 2012.

Just this week, the fallout of the breaches at both Target (NYSE:TGT) and Neiman Marcus continued to unravel with corporate officials testifying on Capitol Hill and how many stores were hit.

Javelin's report has been conducted for the past 11 years, and this report draws on responses from 5,634 consumers to identify the impacts of fraud nationwide.

While the number of victims increased year over year,  the amount of defrauded money decreased by $3 billion to $18 billion compared to 2012. Al Pascual of Javelin Strategy &

Research, points to advancements in the financial industry that has made it better at detecting new instances of fraud is behind the drop in compromised funds as criminals have a harder time creating new fraudulent accounts.

"In 2012, we had a big spike in new fraud with a high average fraud amount," he says. "But in 2013, that was pushed down with criminals shifting into existing card fraud."

Advertisement

This shift means we will see more breaches like those that hit Target and Neiman, he adds. And as individuals continue migrating their financial lives online, identity thieves and scammers will focus more attention targeting online banks and payment sites like Paypal.

"They will go where the money is. The behavior we exhibit using passwords is exacerbating the issue as well."

The more passwords a consumer has for different online accounts, the less likely they are to change them, he says, which is good news for scammers. Consumers with less than 10 online accounts usually use different passwords for each account. But when the amount of online accounts climbs higher to 20, the survey shows people are more likely to use the same password for multiple accounts.

"This is driving a lot of fraud diversification," he says. The study finds fraudsters are increasingly turning to eBay (NASDAQ:EBAY), Amazon (NASDAQ: AMZN) and Paypal with stolen information to make purchases.

One in every three people who is notified of being a potential fraud victim becomes one, Javelin reports, with 46% of consumers who had cards breached becoming fraud victims that same year. This is up from one in four in 2012.

Account takeovers to commit fraud have hit a record in incidence, with 28% of fraud losses.

While it's clear identity scams and data breaches are on the rise, the financial industry is scrambling to figure out how to better protect consumers.

Case 2:21-cv-01959   Document 1-1   Filed 03/03/21   Page 63 of 103   Page ID #:70

There's been much talk of bringing chip-based, or EMV cards to the U.S., but little action from major banks and retailers, likely because of the cost associated with installing terminals to read the cards.

Pascual says change is clearly necessary, and expects a major shift over the next five years.

"Consumers pay the bill—we suffer the fraud, pay increased costs. But we still need to depend on businesses to make the changes for us," he says. "The checkout counter is really a crap shoot, it's become Russian roulette. You have no idea if that retailer has been breached."

More cooperation between the financial industry and retailers will be necessary to spark change.

"They are really antagonistic toward one another and I don't expect them to be holding hands and singing 'Kumbaya' anytime soon," Pascual says. "We need time. And pressure from Capitol Hill."

Exhibit G

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*

December 2013, NCJ 243779

# Victims of Identity Theft, 2012

Erika Harrell, Ph.D. and Lynn Langton, Ph.D., *BJS Statisticians*

**Bulletin**

Approximately 16.6 million persons or 7% of all U.S. residents age 16 or older, were victims of one or more incidents of identity theft on 2012 (figure 1). Among identity theft victims, existing bank (37%) or credit card accounts (40%) were the most common types of misused information.

This report uses data from the 2012 Identity Theft Supplement (ITS) to the National Crime Victimization Survey (NCVS). From January to June 2012, the ITS collected data from persons who experienced one or more attempted or successful incidents of identity theft during the 12 months preceding their interview.

Identity theft victims are defined as persons age 16 or older who experienced one or more of the following incidents:

- unauthorized use or attempted use of an existing account, such as a credit or debit card, checking, savings, telephone, online, or insurance account (referred to as fraud or misuse of an existing account).

**FIGURE 1**
**Persons age 16 or older who experienced at least one identity theft incident during the past 12 months, by type of theft, 2012**



Note: See table 1 for estimates and appendix table 1 for standard errors.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

## Highlights

The purpose of this report is to describe the prevalence of identity theft, its victims, and the characteristics and effects of this crime. The 2012 Identity Theft Supplement (ITS) of the National Crime Victimization Survey (NCVS) provided the data for this report.

- About 7% of persons age 16 or older were victims of identity theft in 2012.

- The majority of identity theft incidents (85%) involved the fraudulent use of existing account information, such as credit card or bank account information.

- Victims who had personal information used to open a new account or for other fraudulent purposes were more likely than victims of existing account fraud to experience financial, credit, and relationship problems and severe emotional distress.

- About 14% of identity theft victims experienced out-of-pocket losses of $1 or more. Of these victims, about half suffered losses of less than $100.

- Over half of identity theft victims who were able to resolve any associated problems did so in a day or less; among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems.

- About 36% of identity theft victims reported moderate or severe emotional distress as a result of the incident.

- Direct and indirect losses from identity theft totaled $24.7 billion in 2012.



- unauthorized use or attempted use of personal information to open a new account, such as a credit or debit card, telephone, checking, savings, loan, or mortgage account (referred to as fraud or misuse of a new account).

- misuse of personal information for a fraudulent purpose, such as getting medical care, a job, or government benefits; renting an apartment or house; or providing false information to law enforcement when charged with a crime or traffic violation (referred to as fraud or misuse of personal information).

This report details the number, percentage, and demographic characteristics of victims who reported one or more incidents of identity theft during a 12-month period. It focuses on the most recent incident experienced to describe victim characteristics and victim responses to identity theft. It describes how the victim discovered the crime; financial losses and other consequences of identity theft, including the amount of time victims spent resolving associated problems; reporting of the incident to credit card companies, credit bureaus, and law enforcement agencies; and the level of distress identity theft victims experienced.

### For 85% of identity theft victims, the most recent incident involved the unauthorized use of an existing account

In 2012, the unauthorized misuse or attempted misuse of an existing account was the most common type of identity theft, experienced by 15.3 million persons age 16 or older (6% of all persons) (table 1). The majority of victims experienced the fraudulent use of their credit cards (7.7 million or 3% of all persons) or bank accounts (7.5 million or 3% of all persons). Another 1.7 million victims (0.7% of all persons) experienced other types of existing account theft, such as misuse or attempted misuse of an existing telephone, online, or insurance account.

An estimated 1.1 million victims (less than 1% of all persons) reported the fraudulent misuse of their information to open a new account, such as a credit card. Another 833,600 victims reported the misuse of their personal information for other fraudulent purposes.

In 2012, 22% of victims experienced multiple incidents of identity theft, while 77% experienced a single incident (not shown).[1] During the single or most recent identity theft incident experienced in 2012, 8% or 1.2 million victims experienced multiple types of identity theft during a single incident. For 66% of victims of multiple types of identity theft, the incident involved the unauthorized use of a combination of existing accounts, such as credit card, checking, savings, telephone, or online accounts. The remaining 34% who experienced multiple types of identity theft during a single incident (less than 3% of all victims) reported some combination of misuse of an existing account, misuse of personal information to open a new account, and personal information used for other fraudulent purposes.

---

[1]About 1% of victims did not know whether they experienced one or more than one incident.

---

## TABLE 1
**Persons age 16 or older who experienced at least one identity theft incident in the past 12 months, by type of theft, 2012**

| Type of identity theft | Anytime during the past 12 months[a] | | Most recent incident[b] | | |
|---|---|---|---|---|---|
| | Number of victims | Percent of all persons | Number of victims | Percent of all persons | Percent of all victims |
| **Total** | 16,580,500 | 6.7% | 16,580,500 | 6.7% | 100% |
| **Existing account** | 15,323,500 | 6.2% | 14,022,100 | 5.7% | 84.6% |
| Credit card | 7,698,500 | 3.1 | 6,676,300 | 2.7 | 40.3 |
| Bank | 7,470,700 | 3.0 | 6,191,500 | 2.5 | 37.3 |
| Other | 1,696,400 | 0.7 | 1,154,300 | 0.5 | 7.0 |
| **New account** | 1,125,100 | 0.5% | 683,400 | 0.3% | 4.1% |
| **Personal information** | 833,600 | 0.3% | 622,900 | 0.3% | 3.8% |
| **Multiple types** | ~ | ~ | 1,252,000 | 0.5% | 7.6% |
| Existing account[b] | ~ | ~ | 824,700 | 0.3 | 5.0 |
| Other[c] | ~ | ~ | 427,400 | 0.2 | 2.6 |

Note: Detail may not sum to total due to victims who reported multiple incidents of identity theft and rounding. See appendix table 1 for standard errors.
~Not applicable.
[a]Identity theft classified as a single type.
[b]Includes victims who experienced two or more of the following: unauthorized use of a credit card, bank account, or other existing account.
[c]Includes victims who experienced two or more of the following: unauthorized use of an existing account, misuse of personal information to open a new account, or misuse of personal information for other fraudulent purposes.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**Persons in households with higher annual incomes were more likely to experience identity theft than persons in lower-income households**

A similar percentage of males and females (7%) experienced identity theft in 2012 (table 2). Across all types of identity theft, prevalence rates did not vary significantly by sex. After accounting for whether a person owned a credit card and bank account, prevalence rates for existing credit card and existing banking account misuse did not vary by sex.

Persons ages 16 to 17 (less than 1%) were the least likely to experience identity theft, followed by persons ages 18 to 24 (5%) and 65 or older (5%). After accounting for credit card ownership, persons ages 16 to 24 were the least likely to experience the misuse of an existing account, while persons age 65 or older had a similar prevalence rate as persons ages 25 to 34. Among those who had a bank account, persons ages 16 to 17 and 65 or older were the least likely to experience banking account fraud.

A greater percentage of white non-Hispanics (7%) experienced identity theft in 2012 than black non-Hispanics (5%) and Hispanics (5%). This relationship also held true for the misuse of an existing credit card account among persons who had a credit card. However, among persons who had a bank account, there were no significant differences in the prevalence of bank account misuse among whites, blacks, and Hispanics.

Overall, persons in the highest income category (those with an annual household income of $75,000 or more) had a higher prevalence of identity theft than persons in other income brackets. After accounting for credit card ownership, persons in the highest income bracket had the highest rate of existing credit card account misuse. Among persons who had a bank account, there were no significant differences in the prevalence of identity theft across income categories, with the exception of the unknown category.

### TABLE 2
**Persons age 16 or older who experienced at least one identity theft incident during the past 12 months, by victim characteristics, 2012**

| Characteristic | Any identity theft | | Misuse of existing credit card | | | Misuse of existing bank account | | | New account or personal information[a] | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of victims | Percent of all persons | Number of victims | Percent of all persons | Percent of persons with credit card | Number of victims | Percent of all persons | Percent of persons with bank account | Number of victims | Percent of all persons |
| **Total** | 16,580,500 | 6.7% | 7,698,500 | 3.1% | 4.5% | 7,470,700 | 3.0% | 3.5% | 1,864,100 | 0.8% |
| **Sex** | | | | | | | | | | |
| Male | 7,902,800 | 6.6% | 3,932,000 | 3.3% | 4.8% | 3,320,100 | 2.8% | 3.3% | 851,200 | 0.7% |
| Female | 8,677,700 | 6.9 | 3,766,400 | 3.0 | 4.3 | 4,150,600 | 3.3 | 3.8 | 1,012,900 | 0.8 |
| **Age** | | | | | | | | | | |
| 16–17 | 35,200 ! | 0.4% ! | 4,300 ! | 0.1% ! | 0.7% ! | 16,300 ! | 0.2% ! | 0.6% ! | 5,800 ! | 0.1% ! |
| 18–24 | 1,466,400 | 4.8 | 331,400 | 1.1 | 2.6 | 937,400 | 3.1 | 4.1 | 182,400 | 0.6 |
| 25–34 | 3,293,500 | 7.8 | 1,177,500 | 2.8 | 4.1 | 1,718,100 | 4.1 | 4.7 | 406,700 | 1.0 |
| 35–49 | 4,914,800 | 8.0 | 2,222,100 | 3.6 | 4.8 | 2,344,600 | 3.8 | 4.3 | 531,900 | 0.9 |
| 50–64 | 4,739,400 | 7.8 | 2,590,400 | 4.2 | 5.4 | 1,853,300 | 3.0 | 3.3 | 501,500 | 0.8 |
| 65 or older | 2,131,100 | 5.0 | 1,372,800 | 3.2 | 4.1 | 601,100 | 1.4 | 1.6 | 235,800 | 0.6 |
| **Race/Hispanic origin** | | | | | | | | | | |
| White[b] | 12,417,600 | 7.3% | 6,258,500 | 3.7% | 4.9% | 5,295,000 | 3.1% | 3.4% | 1,146,400 | 0.7% |
| Black[b] | 1,494,100 | 5.0 | 301,400 | 1.0 | 2.1 | 896,300 | 3.0 | 4.2 | 361,500 | 1.2 |
| Hispanic/Latino | 1,544,100 | 5.2 | 509,100 | 1.7 | 3.1 | 834,300 | 2.8 | 3.8 | 254,000 | 0.8 |
| Other race[b,c] | 841,400 | 6.4 | 523,900 | 4.0 | 5.4 | 302,700 | 2.3 | 2.7 | 54,000 | 0.4 |
| Two or more races[b] | 270,700 | 9.0 | 102,000 | 3.4 | 5.9 | 133,400 | 4.4 | 5.3 | 48,200 | 1.6 |
| **Household income** | | | | | | | | | | |
| $24,999 or less | 1,888,000 | 4.9% | 413,200 | 1.1% | 2.6% | 1,068,800 | 2.8% | 3.9% | 419,400 | 1.1% |
| $25,000–$49,999 | 2,809,100 | 5.4 | 1,026,100 | 2.0 | 3.0 | 1,490,200 | 2.9 | 3.4 | 443,500 | 0.9 |
| $50,000–$74,999 | 2,598,500 | 7.7 | 1,084,600 | 3.2 | 4.1 | 1,305,800 | 3.8 | 4.2 | 259,000 | 0.8 |
| $75,000 or more | 6,274,800 | 10.0 | 3,668,900 | 5.9 | 6.8 | 2,389,800 | 3.8 | 4.0 | 426,100 | 0.7 |
| Unknown | 3,010,100 | 5.1 | 1,505,700 | 2.6 | 3.7 | 1,216,200 | 2.1 | 2.4 | 316,100 | 0.5 |

Note: Estimates are based on the most recent identity theft incident. Includes successful and attempted identity theft in which the victim experienced no loss. See appendix table 2 for standard errors.
! Interpret with caution; estimate is based on 10 or fewer sample cases or coefficient of variation is greater than 50%.
[a]Includes the misuse of personal information to open a new account or to commit other fraud.
[b]Excludes persons of Hispanic or Latino origin.
[c]Includes persons identifying as American Indian, Alaska Native, Asian, Hawaiian, or other Pacific Islander.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

## The most common way victims discovered the identity theft was from contact by a financial institution about a problem

The way victims discovered that their identifying information was misused varied by the type of identity theft. Among victims who experienced the unauthorized use of an existing account, 45% discovered the identity theft when a financial institution contacted them about suspicious activity on their account (figure 2). In comparison, 15% of victims who experienced the misuse of personal information to open a new account or for other fraudulent purposes discovered the incident when a financial institution contacted them. Victims of these other types of identity theft were more likely than victims of existing account misuse to discover the incident when another type of company or agency contacted them (21%) or after they received an unpaid bill (13%). Twenty percent of victims of existing account misuse discovered the incident because of fraudulent charges on their account, compared to 8% of victims of other types of identity theft.

**FIGURE 2**
**Most common ways victims discovered identity theft, by type of theft, 2012**



Note: Estimates are based on the most recent incident of identity theft. See appendix table 3 for estimates and standard errors for all ways that victims discovered the identity theft.
*Includes identity theft incidents involving the misuse of personal information to open a new account or for other fraudulent purposes.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

#### The majority of identity theft victims did not know how the offender obtained their information

About 32% of identity theft victims knew how the offender obtained their information (figure 3). Victims who experienced multiple types of identity theft during a single incident (47%) were among the most likely victims to know how the offender obtained the information. Victims who had an existing credit card account misused (24%) were among the least likely to know how the offender obtained the account information. Of the 5.3 million victims who knew how the identity theft occurred, the most common way offenders obtained information (43%) was to steal it during a purchase or other transaction (not shown).

#### 9 in 10 identity theft victims did not know anything about the offender

Overall, most identity theft victims (91%) in 2012 did not know anything about the identity of the offender (table 3). However, the percentage of victims who knew something about offender varied depending on the type of identity theft. Victims who had personal information used to open a new account (25%) or for other fraudulent purposes (23%) were more likely than victims of existing account misuse (7%) to know something about the offender. Across all types of identity theft, victims who experienced the misuse of an existing credit card (3%) were the least likely to know something about the offender.

**FIGURE 3**

**Identity theft victims who knew how their personal information was obtained, by type of theft, 2012**



Note: Estimates are based on the most recent incident of identity theft. See appendix table 4 for estimates and standard errors.
*Includes victims who experienced more than one type of identity theft in a single incident.
Source: Bureau of Justice Statistics, National Crime Victimziation Survey, Identity Theft Supplement, 2012.

**TABLE 3**

**Identity theft victims who knew something about the offender, by type of theft, 2012**

| Type of identity theft | Victim knew something about the offender |
|---|---|
| Total | 8.6% |
| **Existing account** | 6.6 |
|   Credit card | 2.7 |
|   Bank | 9.2 |
|   Other | 15.9 |
| **New account** | 24.6 |
| **Personal information** | 22.9 |
| **Multiple types** | 15.1 |
|   Existing account[a] | 11.0 |
|   Other[b] | 23.1 |

Note: Estimates are based on the most recent incident of identity theft. See appendix table 5 for standard errors.
[a]Includes victims who experienced two or more of the following: unauthorized use of a credit card, bank account, or other existing account.
[b]Includes victims who experienced two or more of the following: unauthorized use of an existing account, misuse of personal information to open a new account, or misuse of personal information for other fraudulent purposes.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

## Two-thirds of identity theft victims reported a direct financial loss

The economic impact of identity theft is comprised of direct and indirect financial loss. Direct financial loss, the majority of the total loss associated with identity theft, refers to the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. Indirect loss includes any other costs caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses (e.g., postage, phone calls, or notary fees). Direct and indirect losses do not necessarily reflect personal losses to victims, as victims may be reimbursed for some or all of the direct and indirect losses.

In 2012, 68% of identity theft victims reported a combined direct and indirect financial loss associated with the most recent incident (appendix table 8). Overall, victims who experienced a direct and indirect financial loss of at least $1 lost an average of $1,769 with a median loss of $300.

The amount of financial loss varied by the type of identity theft. Approximately 69% of credit card fraud, 74% of bank fraud, 46% of new account fraud, and 38% of personal information fraud victims experienced a financial loss during the past 12 months. Of those victims who experienced multiple types of identity theft, 69% reported a financial loss.

In 2012, 66% of the 16.6 million victims of identity theft reported a direct financial loss as a result of the identity theft incident. About 68% of credit card fraud victims, 74% of bank fraud victims, 42% of new account fraud victims, and 32% of personal information fraud victims reported that the offender obtained money, goods, or services. Of those victims who experienced multiple types of identity theft, 67% reported a direct financial loss associated with the incident.

Of those who reported a direct financial loss, victims who experienced the misuse of their personal information reported a mean direct loss of $9,650 and a median direct loss of $1,900. Victims of new account fraud incurred an average loss per incident of $7,135 and a median loss of $600. Victims of multiple types of fraud reported an average direct loss of $2,140 with a median direct loss of $400, while victims of existing account misuse had an average loss of $1,003 per incident with a median direct loss of $200.

In addition to any direct financial loss, 6% of all identity theft victims reported indirect losses associated with the most recent incident of identity theft. Victims who suffered an indirect loss of at least $1 reported an average indirect loss of $4,168, with a median of $30. With the exception of victims of personal information fraud, identity theft victims who reported indirect financial loss had a median indirect loss of $100 or less.

## Direct and indirect identity theft losses totaled $24.7 billion in 2012

Identity theft victims reported a total of $24.7 billion in direct and indirect losses attributed to all incidents of identity theft experienced in 2012 (table 4).[2] These losses exceeded the $14 billion victims lost from all other property crimes (burglary, motor vehicle theft, and theft) measured by the National Crime Victimization Survey in 2012. Identity theft losses were over 4 times greater than losses due to stolen money and property in burglaries ($5.2 billion) and theft ($5.7 billion), and eight times the total losses associated with motor vehicle theft ($3.1 billion).

[2]For victims who experienced multiple incidents of identity theft, the total includes losses from all incidents experienced during the past 12 months.

### TABLE 4
**Mean, median, and total losses attributed to identity theft and property crime, 2012**

| | Mean | Median | Total (in thousands) |
|---|---|---|---|
| **Identity theft**[a] | $2,183 | $300 | $24,696,300 |
| **Property crime**[b] | $915 | $150 | $13,991,700 |
| Burglary | 2,378 | 600 | 5,234,800 |
| Motor vehicle theft | 7,963 | 4,000 | 3,079,900 |
| Theft | 447 | 100 | 5,677,000 |

Note: See appendix table 6 for standard errors.
[a]Based on 11.3 million persons 16 or older who experienced one or more incidents of identity theft with known losses of $1 or more.
[b]Based on 15.3 million household property crimes, 2.2 million burglaries, 400,000 motor vehicle thefts, and 12.7 million household thefts with known losses of $1 or more. In 2012, 19% of completed burglaries had unknown loss amounts.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2012, and National Crime Victimization Survey, Identity Theft Supplement, 2012.

### In 2012, 14% of identity theft victims suffered an out-of-pocket financial loss

In some instances, a company (e.g., credit card or insurance company) may reimburse some or all of the financial loss, reducing or eliminating the out-of-pocket losses for victims. At the time of the interview, 14% of victims of identity theft had experienced personal out-of-pocket financial losses of $1 or more. Of these victims who suffered an out-of-pocket financial loss, 49% had total losses of $99 or less (figure 4). About 18% of victims reported out-of-pocket expenses of $100 to $249. An additional 16% of identity theft victims reported that out-of-pocket expenses of $1,000 or more.

### Victims of identity theft who experienced existing account misuse were the least likely to have credit-related problems

In addition to suffering monetary losses, some identity theft victims experienced other financial and legal problems. They paid higher interest rates on credit cards, they were turned down for loans or other credit, their utilities were turned off, or they were the subject of criminal proceedings. Victims who experienced the misuse of an existing account were generally less likely to experience financial and legal problems as a result of the incident than victims who had other personal information misused. In 2012, 2% of victims of existing account misuse experienced problems with debt collectors, compared to 17% of victims who had personal information misused (figure 5). Two percent of victims of existing account misuse experienced

credit-related problems (e.g., higher interest rates or repeatedly having to correct information on a credit report), compared to 12% of victims of other types of identity theft. Less than 1% of victims of existing account misuse and 3% of victims of other types of identity theft had utilities cut off or service denied, legal problems (e.g., being arrested), or other problems (e.g., income tax issues).

**FIGURE 4**
**Total out-of-pocket loss for identity theft victims experiencing a loss of $1 or more, 2012**



Note: Financial loss is computed from the 14% of identity theft victims who experienced a personal loss of at least $1. Estimates are based on the most recent incident of identity theft. See appendix table 7 for estimates and standard errors.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**FIGURE 5**
**Victims who experienced financial or legal problems as a result identity theft, by type of theft, 2012**



Note: Estimates are based on the most recent identity theft incident. See appendix table 10 for estimates and standard errors.
[a]Includes victims who experienced multiple types of existing account misuse.
[b]Includes identity theft incidents involving the misuse of personal information to open a new account or for other fraudulent purposes.
[c]Includes problems such as having to correct the same information on a credit report repeatedly, being turned down for credit or loans, or paying higher interest rates.
[d]Includes problems such as being turned down for a checking account or having checks bounce.
[e]Includes being the subject of a lawsuit or other criminal proceedings, or being arrested.
[f]Includes problems such as being turned down for a job, losing a job, or problems with income taxes.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**Identity theft victims were less likely than violent crime victims to have significant school, work, or relationship problems as a result of the crime**

The 2012 NCVS asked victims of violent crime (including rape or sexual assault, robbery, aggravated assault, and simple assault) about the impact of the victimization on work, school, and personal relationships, and the amount of emotional distress it caused. Compared to violent crime victims surveyed in 2012, a lower percentage of identity theft victims reported significant problems at work or school or with family members or friends due to the incident (figure 6). About 1% of identity theft victims reported significant problems at work or school, compared to 12% of violent crime victims. Similarly, 4% of

identity theft victims reported significant problems with family members or friends, compared to 19% of violent crime victims.

The percentage of identity theft victims who reported significant problems at work or school as a result of the incident varied by type of identity theft. About 6% of victims who had personal information used to open a new account reported significant problems at work or school, compared to about 1% of victims of existing credit card and bank account misuse (appendix table 11). The largest percentage of identity theft victims who had significant problems with family or friends had their personal information used to create new accounts (10%) or for other fraudulent purposes (10%).

**FIGURE 6**
**Victims of identity theft and violent crime who experienced problems as a result of the victimization, 2012**



Note: Estimates are based on the most recent incident of identity theft. Victims reported their perceptions of whether the victimization led to significant problems and problems at work or school with family and friends. Total violent crime includes rape/sexual assault, robbery, aggravated assault, and simple assault. Includes violent crime victims (14%) with missing information on relationship, work, and school problems due to crime. See appendix table 11 for estimates and appendix table 12 for standard errors.
*Includes victims who experienced more than one type of identity theft in a single incident.
[a]Includes victims reporting significant problems with family members or friends, including getting into more arguments or fights than before, not feeling able to trust them as much, or not feeling as close to them as before the crime.
[b]Includes victims reporting significant problems with job or school, such as trouble with boss, coworker, or peers.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2012, and National Crime Victimization Survey, Identity Theft Supplement, 2012.

Identity theft victims (10%) were also less likely than violent crime victims (29%) to report that the victimization was severely distressing (figure 7). However, the level of emotional distress varied by type of identity theft. Thirty-two percent of victims of personal information fraud reported that they found the incident severely distressing, compared to 5% of credit card fraud victims. Twenty-two percent of victims of new account fraud reported that the crime was severely distressing.

**FIGURE 7**
**Level of emotional distress reported by identity theft and violent crime victims, 2012**



Note: Estimates are based on the most recent incident of identity theft. Victims reported whether they found the victimization to be not at all distressing, mildly distressing, moderately distressing, or severly distressing. Detail may not sum to total due to rounding. Excludes identity theft victims (less than 1%) and violent crime victims (15%) with missing data on emotional distress. See appendix table 11 for estimates and appendix table 12 for standard errors.
*Includes victims who experienced more than one type of identity theft in a single incident.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2012, and National Crime Victimization Survey, Identity Theft Supplement, 2012.

### The majority of identity theft victims spent a day or less resolving associated financial and credit problems

At the time of the interview, 86% of identity theft victims had resolved any problems associated with the incident (appendix table 13). Of these, the majority spent a day or less clearing up the problems, while about 10% spent more than a month (figure 8). Victims of the misuse of existing accounts (54%) were more likely to resolve any associated financial and credit problems within a day, compared to victims of new account fraud (42%) and victims of multiple types of identity theft (36%). Among victims who had resolved all problems associated with the identity theft, 29% who experienced the misuse of personal information for fraudulent purposes spent over a month clearing up the problems, compared to 9% of victims of existing account misuse.

Whether identity theft victims had resolved associated problems or not at the time of the interview, victims reported spending an average of about 9 hours clearing up the issues. Victims of existing credit card account misuse spent an average of 3 hours resolving problems, while victims whose personal information was used to open a new account or for other fraudulent purposes spent an average of about 30 hours resolving all problems (not shown).

**FIGURE 8**

**Length of time spent resolving financial and credit problems associated with identity theft, by type of identity theft, 2012**



Note: Estimates are based on the most recent incident of identity theft. See appendix table 13 for estimates and appendix table 14 for standard errors.
*Includes victims who experienced more than one type of identity theft in a single incident.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

# 14% of persons experienced identity theft at some point during their lives

Resolving the problems caused by identity theft may take more than a year for some victims. Of the 20.3 million persons age 16 or older who experienced the misuse of existing accounts or other personal information prior to 2012, 7% were still resolving the problems associated with the identity theft more than a year later (table 5). A greater percentage of persons who experienced the misuse of personal information to open a new account (16%) or for other fraudulent purposes (15%) prior to 2012 had unresolved problems more than a year later, compared to persons who experienced existing account misuse (4%).

Overall, 14% of persons age 16 or older, or 34.2 million persons, experienced one or more incidents of identity theft during their lives. The lifetime prevalence rate for identity theft varied to some degree with age. Younger persons, ages 16 to 17 (1%) and 18 to 24 (7%) and persons ages 65 or older (11%) had the lowest lifetime prevalence rates, while between 15% and 17% of persons ages 25 to 64 experienced identity theft at some point in their lives (not shown in table).

## TABLE 5
**Persons age 16 or older who experienced identity theft at any point in their lives, type of identity theft they experienced outside of the past year, and ongoing problems from identity theft that occurred outside of the past year, 2012**

| | Number of persons | Percent of all persons | Percent with unresolved problems resulting from identity theft[a] |
|---|---|---|---|
| **Experienced at least one incident of identity theft during lifetime** | | | |
| No | 211,327,500 | 86.0% | ~ |
| Yes | 34,237,400 | 13.9 | 7.8% |
| **Experienced at least one incident of identity theft outside of past 12 months** | | | |
| No | 225,127,300 | 91.6% | ~ |
| Yes | 20,334,600 | 8.3 | 7.3% |
| Type of identity theft experienced | | | |
| Existing account | 15,311,100 | 6.2% | 4.0% |
| Credit card | 8,860,400 | 2.3 | 2.8 |
| Bank account | 5,721,700 | 3.6 | 5.9 |
| Other account | 729,000 | 0.3 | 7.7 |
| New account | 1,585,100 | 0.6 | 16.1 |
| Personal information | 1,947,700 | 0.8 | 14.9 |
| Multiple types | 1,450,300 | 0.6% | 20.6% |
| Existing accounts[b] | 572,800 | 0.2 | 11.1 |
| Other[c] | 877,500 | 0.4 | 26.7 |

Note: Detail may not sum to same population total due to a small number of victims who did not know whether they experienced identity theft during the lifetime or outside of the past 12 months. See appendix table 15 for standard errors.
~Not applicable.
[a]Based on number of persons who experienced the identity theft.
[b]Includes victims who experienced two or more of the following: unauthorized use of a credit card, bank account, or other existing account.
[c]Includes victims who experienced two or more of the following: unauthorized use of an existing account, misuse of personal information to open a new account, or misuse of personal information for other fraudulent purposes.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**The level of emotional distress victims experienced was related to the length of time they spent resolving problems**

Victims who spent more time resolving the financial and credit-related problems associated with the identity theft incident were more likely to experience problems with work and other relationships and severe emotional distress than victims who were able to resolve the problems relatively quickly. Among identity theft victims who spent 6 months or more resolving financial and credit problems due to the theft, 47% experienced severe emotional distress (figure 9). In comparison, 4% of victims who spent a day or less clearing up problems reported that the incident was severely distressing. Similarly, 14% of victims who spent 6 months or more resolving issues related to the identity theft reported having significant problems with family members or friends, compared to about 2% of victims who spent a day or less resolving problems.

**Fewer than 1 in 10 identity theft victims reported the incident to police**

In 2012, about 9% of identity theft victims reported the incident to police (figure 10). Victims of personal information fraud were the most likely to report the incident to police (40%), followed new account fraud victims (23%) and victims of multiple types of identity theft (22%). Fewer than 10% of victims of existing credit card (4%), existing bank account (9%), and other existing account misuse (6%) reported the incident to police.



**FIGURE 10**
**Identity theft victims who reported the incident to police, by type of identity theft, 2012**

Note: Estimates are based on the most recent identity theft incident. See appendix table 17 for estimates and reasons victims did not report to police. See appendix table 18 for standard errors.

*Includes victims who experienced more than one type of identity theft in a single incident.

Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**FIGURE 9**
**Identity theft victims who reported work/school or family/friend problems or distress, by length of time spent resolving associated financial and credit problems, 2012**



Note: Estimates are based on the most recent incident of identity theft. See appendix table 16 for estimates and standard errors.

aIncludes victims reporting significant problems with job or school, such as trouble with boss, coworker, or peers.

bIncludes victims reporting significant problems with family members or friends, including getting into more arguments or fights than before, not feeling able to trust them as much, or not feeling as close to them as before the crime.

Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

The 91% of identity theft victims who did not report an incident to police offered a variety of reasons for not reporting (appendix table 17). Among all victims who did not report the incident to police, the most common reason was that the victim handled it another way (58%). About a third (29%) of nonreporting victims did not contact police because they suffered no monetary loss. One in five nonreporting victims did not think that the police could help and another 15% did not know how to report the incident to law enforcement.

## Of the 9% of identity theft victims who contacted a credit bureau, 7 in 10 placed a fraud alert on their credit report

In 2012, 88% of all victims of identity theft reported the incident to one or more nonlaw enforcement agencies, either government or commercial (not shown). About 86% of identity theft victims contacted a credit card company or bank to report misuse or attempted misuse of an account or personal information (appendix table 19). Six percent of all identity theft victims contacted a credit monitoring service, 3% contacted an agency that issues identity documentation, (e.g., Social Security

Administration or an agency that issues drivers' licenses), 1% contacted the Federal Trade Commission, and 1% contacted a government consumer affairs agency or other consumer protection organization, (e.g., Better Business Bureau).

Nine percent of identity theft victims contacted a credit bureau to report the incident. Victims whose identifying information was fraudulently used to open a new account (30%) were most likely to contact a credit bureau, followed by victims of multiple types of theft (20%) and victims whose personal information was used for other fraudulent purposes (19%).

Victims of any type of identity theft who contacted a credit bureau could take several different actions. About 70% of victims who contacted a credit bureau placed a fraud alert on their credit report (figure 11). Two-thirds (66%) of victims who contacted a credit bureau requested a credit report, 41% requested corrections to their credit report, 38% placed a freeze on their credit report, and 19% provided a police report to the credit bureau.

**FIGURE 11**
**Identity theft victims who contacted a credit bureau, by action taken, 2012**



Note: Estimates are based on victims who contacted a credit bureau regarding the most recent incident of identity theft experienced within the past 12 months. Details sum to more than 100% because some victims took multiple actions with the credit bureau. See appendix table 19 for estimates and appendix table 20 for standard errors.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

## About 85% of persons took some action to prevent identity theft victimization

The ITS asked persons about actions they took during the prior 12 months to prevent identity theft, such as checking credit reports, shredding documents with personal information, and changing passwords on financial accounts. In 2012, 85% of persons engaged in one or more of the preventative actions asked about in the survey (table 6). A greater percentage of victims (96%) than nonvictims (84%) engaged in at least one preventative action. However, about 12% of victims who took preventative action did so in response to experiencing identity theft in the past year.

Overall, the two most common preventative actions in 2012 were checking bank or credit statements (75%) and shredding or destroying documents with personal information (67%). A higher percentage of victims than nonvictims engaged in both of these preventative actions. However, about 13% of victims

began shredding or destroying documents with personal information as a result of experiencing identity theft during the prior 12 months and 26% began checking bank or credit statements as a result of the victimization.

Less than 10% of victims purchased identity theft protection (4%) or insurance (6%) or used an identity theft security program on the computer (6%) after experiencing identity theft, while about a quarter of victims checked financial accounts or changed passwords on these accounts as a result of the victimization.

Among persons who did not experience identity theft in 2012, 37% checked their credit report; 27% changed passwords on financial accounts; 16% used identity theft security programs on their computer; 5% purchased identity theft insurance or used a credit monitoring service; and 3% purchased identity theft protection.

**TABLE 6**
**Actions victims and nonvictims took during the past 12 months to reduce the risk of identity theft, by whether the action was taken in response to the theft, 2012**

| Type of action | Total | Nonvictims | Percent of persons age 16 or older | | |
|---|---|---|---|---|---|
| | | | Victim during prior 12 months | | |
| | | | Total | Action taken in response to identity theft | Action taken independently of identity theft in past year |
| Any | 84.5% | 83.7% | 96.4% | 11.8% | 84.6% |
| Checked credit report | 37.9 | 36.8 | 53.1 | 15.0 | 38.1 |
| Changed passwords on financial accounts | 28.6 | 26.6 | 56.1 | 24.4 | 31.7 |
| Purchased identity theft insurance/credit monitoring service | 5.3 | 4.9 | 11.8 | 5.7 | 6.1 |
| Shredded/destroyed documents with personal information | 67.4 | 66.5 | 79.8 | 13.0 | 66.8 |
| Checked bank or credit statements | 74.8 | 73.6 | 91.8 | 25.6 | 66.2 |
| Used identity theft security program on computer | 16.6 | 16.1 | 24.5 | 5.7 | 18.8 |
| Purchased identity theft protection | 3.5 | 3.2 | 6.8 | 3.9 | 3.0 |

Note: Estimates are based on the most recent incident of identity theft. About 1% of victims and nonvictims did not know or did not report whether actions were taken. See appendix table 21 for standard errors.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

## Methodology

### Data collection

The Identity Theft Supplement (ITS) was administered as a supplement to the Bureau of Justice Statistic's (BJS) National Crime Victimization Survey (NCVS). The NCVS collects data on crime reported and not reported to the police against persons age 12 or older from a nationally representative sample of U.S. households. The sample includes persons living in group quarters (such as dormitories, rooming houses, and religious group dwellings) and excludes persons living in military barracks and institutional settings (such as correctional or hospital facilities) and the homeless. (For more information, see the *Survey Methodology* in *Criminal Victimization in the United States, 2008*, NCJ 231173, BJS website, May 2011.)

From January 1, 2012, through June 30, 2012, persons age 16 or older in sampled NCVS households received the ITS at the end of the NCVS interview. Proxy responders and those who complete the NCVS interview in a language other than English did not receive the ITS. All NCVS and ITS interviews were conducted using computer-assisted personal interviewing (CAPI). Interviews were conducted by telephone or by personal visit. A final sample size of 69,814 of the original NCVS-eligible respondents completed the ITS questionnaire, resulting in a response rate of 91.9%.

The combined overall NCVS-ITS unit response rate for NCVS households, NCVS persons, and ITS persons was 68.2%. Because of the level of nonresponse, a bias analysis was conducted. To the extent that those who responded to the survey and those who did not differ in important ways, there is potential for bias in estimates from the survey data. However, the result of the nonresponse bias analysis suggested that there was little or no bias of substantive importance due to nonresponse in the ITS estimates.

The ITS collected individual data on the prevalence of and victim response to the attempted or successful misuse of an existing account, misuse of personal information to open a new account, or misuse of personal information for other fraudulent purposes. Respondents were asked whether they experienced any of these types of misuse during the 12 months prior to the interview. For example, persons interviewed in July 2012 were asked about identity theft incidents that occurred between July 2011 and June 2012. To simplify the discussion of the findings, this report refers to all identity theft experienced during the 12 months prior to the interviews as occurring in 2012.

Persons who reported one or more incidents of identity theft during 2012 were asked more detailed questions about the incident and response to the incident, such as how they discovered the identity theft; financial, credit, and other problems resulting from the incident; time spent resolving associated problems; and reporting to police and credit bureaus. For most sections of the survey instrument, the ITS asked victims who experienced more than one incident during the 12-month reference period to describe only the most recent incident when answering questions. The ITS asked victims who experienced multiple incidents of identity theft during the year to report on the total financial losses suffered as a result of all incidents. The ITS asked both victims and nonvictims a series of questions about identity theft they experienced outside of the 12-month reference period and about measures they took to avoid or minimize the risk of becoming an identity theft victim.

### Comparison of 2012 findings to prior BJS identity theft statistics

This report uses data that differ from previous BJS statistical collections on the topic of identity theft. Due to the differences, it was not possible to compare the identity theft estimates presented in this report to previously reported estimates.

Initial BJS reports on identity theft used household-level data from the core NCVS. Data were reported for the household as a whole rather than for individual respondents, and the questions were more limited, providing less detail on the characteristics of the incident and the victim response. For additional information, see *Identity Theft, 2005*, NCJ 219411, BJS website, November 2007, *Identity Theft Reported by Households, 2007 - Statistical Tables*, NCJ 230742, BJS website, June 2010, and *Identity Theft Reported by Households, 2005 - 2010*, NCJ 236245, BJS website, December 2010.

In 2008, BJS conducted the first Identity Theft Supplement to the NCVS. Like the 2012 ITS, the 2008 ITS collected detailed information on victim experiences with identity theft from persons age 16 or older. For more information, see *Victims of Identity Theft, 2008*, NCJ 231680, BJS website, December 2010. Following the administration of the first ITS, BJS made substantial changes to the survey instrument, making it difficult to compare across the 2008 and 2012 datasets. Some of the major changes to the survey from 2008 to 2012 included—

- Changing from a 2-year to 1-year reference period. The 2008 ITS asked about identity theft experienced in the 2 years prior to the interview. The 2-year reference period was intended to capture incidents of identity theft that were discovered more than 12 months prior to the interview but were still causing problems for the victim. The 2012 ITS used a 12-month reference period to be more consistent with the NCVS and other NCVS supplements. The 2012 ITS added a special section about identity theft experienced outside of the 1-year reference period to capture identity theft incidents with long-term consequences.

- Integrating of successful and attempted identity theft incidents. The 2008 ITS tried to distinguish attempted identity theft from successfully completed identity theft. It asked slightly different questions depending on whether respondents screened into the attempted or successful module. However, the distinction between an attempted

and successful incident of identity theft was not clear, and the two types were combined for reporting purposes to the extent possible. The 2012 ITS defined identity theft as attempted or completed misuse of personal information and collected the same information from all victims.

- Focusing on the most recent incident of identity theft for detailed follow-up questions. In the 2008 ITS, victims were asked one set of questions about the characteristics of identity theft and the response to identity theft, regardless of the number of incidents they experienced during the 2-year reference period. This made it impossible to attribute the incident characteristics or monetary loss to one specific type of identity theft. The 2012 ITS asked victims to identify whether they experienced one or more than one incidents of identity theft during the year.[3] Victims who experienced more than one incident were asked to describe only the most recent incident when responding to detailed questions about the nature of and experiences with identity theft victimization.

### Possible over-reporting of losses from jointly held accounts

Persons may have experienced the unauthorized use of a jointly held account. Joint accounts present a difficulty with counting financial harm or loss because of the potential for double-counting loss (e.g., both account holders report the same $500 loss). Because financial loss was not attributed to a particular type of identity theft, victims of multiple types of identity theft may have experienced some financial loss from a joint account and some financial loss from an independently held account. Therefore, it was not possible to correct for any potential over-reporting due to joint account holders who may have been double counted.

### Standard error computations

When national estimates are derived from a sample, as is the case with the ITS, caution must be taken when comparing one estimate to another. Although one estimate may be larger than another, estimates based on a sample have some degree of sampling error. The sampling error of an estimate depends on several factors, including the amount of variation in the responses, the size of the sample, and the size of the subgroup for which the estimate is computed. When the sampling error around the estimates is taken into consideration, the estimates that appear different may, not be statistically different.

One measure of the sampling error associated with an estimate is the standard error. The standard error can vary from one estimate to the next. In general, for a given metric, an estimate with a smaller standard error provides a more reliable

approximation of the true value than an estimate with a larger standard error. Estimates with relatively large standard errors are associated with less precision and reliability and should be interpreted with caution.

In order to generate standard errors around estimates from the ITS, the Census Bureau produces generalized variance function (GVF) parameters for BJS. The GVFs take into account aspects of the NCVS complex sample design and represent the curve fitted to a selection of individual standard errors based on the Jackknife Repeated Replication technique. The GVF parameters were used to generate standard errors for each point estimate (i.e., numbers or percentages) in the report.

In this report, BJS conducted tests to determine whether differences in estimated numbers and percentages were statistically significant once sampling error was taken into account. Using statistical programs developed specifically for the NCVS, all comparisons in the text were tested for significance. The primary test procedure used was Student's t-statistic, which tests the difference between two sample estimates. To ensure that the observed differences between estimates were larger than might be expected due to sampling variation, the significance level was set at the 95% confidence level.

Data users can use the estimates and the standard errors of the estimates provided in this report to generate a confidence interval around the estimate as a measure of the margin of error. The following example illustrates how standard errors can be used to generate confidence intervals:

> According to the ITS, in 2012, an estimated 6.7% of persons age 16 or older experienced identity theft (see table 1). Using the GVFs, BJS determined that the estimate has a standard error of 0.3 (see appendix table 1). A confidence interval around the estimate was generated by multiplying the standard errors by ±1.96 (the t-score of a normal, two-tailed distribution that excludes 2.5% at either end of the distribution). Therefore, the confidence interval around the estimate is 6.7 ± (0.3 X 1.96) or 6.1 to 7.3. In other words, if different samples using the same procedures were taken from the U.S. population in 2012, 95% of the time the percentage of persons who experienced identity theft would be between 6.1% and 7.3%.

In this report, BJS also calculated a coefficient of variation (CV) for all estimates, representing the ratio of the standard error to the estimate. CVs provide a measure of reliability and a means to compare the precision of estimates across measures with differing levels or metrics. In cases where the CV was greater than 50%, or the unweighted sample had 10 or fewer cases, the estimate was noted with a "!" symbol (interpret data with caution; estimate is based on 10 or fewer sample cases, or the coefficient of variation exceeds 50%).

---

[3]Victims received the following definition of an identity theft incident: "An incident of identity theft occurs when your identity is stolen. A stolen credit card or debit card may be used multiple times, but this should be considered a single incident. Also, if multiple credit card numbers and a social security number were obtained at the same time, this should be considered a single incident."

Many of the variables examined in this report may be related to one another and to other variables not included in the analyses. Complex relationships among variables were not fully explored in this report and warrant more extensive analysis. Readers are cautioned not to draw causal inferences based on the results presented.

## APPENDIX TABLE 1

**Standard errors for figure 1: Persons age 16 or older who experienced at least one identity theft incident in the past 12 months by type of theft, 2012 and table 1: Persons age 16 or older who experienced at least one identity theft incident in the past 12 months, by type of theft, 2012**

| Type of identity theft | Anytime during the past 12 months | | Most recent incident | | |
|---|---|---|---|---|---|
| | Number of victims | Percent of all persons | Number of victims | Percent of all persons | Percent of all victims |
| Total | 750,223 | 0.3% | 750,223 | 0.3% | ~ |
| Existing account | 713,433 | 0.3 | 673,954 | 0.3 | 1.4 |
| Credit card | 455,777 | 0.2 | 414,852 | 0.2 | 1.7 |
| Bank | 446,837 | 0.2 | 394,659 | 0.2 | 1.7 |
| Other | 167,153 | 0.1 | 129,787 | 0.1 | 0.7 |
| New account | 127,633 | 0.1 | 92,348 | -- | 0.5 |
| Personal information | 104,992 | -- | 87,000 | -- | 0.5 |
| Multiple types | ~ | ~ | 136,881 | 0.1 | 0.8 |
| Existing account | ~ | ~ | 104,263 | -- | 0.6 |
| Other | ~ | ~ | 68,425 | -- | 0.4 |

~Not applicable.
--Less than 0.05%.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

## APPENDIX TABLE 2

**Standard errors for table 2: Persons age 16 or older who experienced at least one identity theft incident during the past 12 months, by victim characteristics, 2012**

| Characteristic | Any identity theft | | Misuse of existing credit card | | | Misuse of existing bank account | | | New account or personal information | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of victims | Percent of all persons | Number of victims | Percent of all persons | Percent of persons with credit card | Number of victims | Percent of all persons | Percent of persons with bank account | Number of victims | Percent of all persons |
| Total | 750,223 | 0.3% | 455,777 | 0.2% | 0.3% | 446,837 | 0.2% | 0.2% | 177,890 | 0.1% |
| **Sex** | | | | | | | | | | |
| Male | 463,715 | 0.4 | 291,937 | 0.2 | 0.3 | 260,879 | 0.2 | 0.2 | 106,429 | 0.1 |
| Female | 493,153 | 0.4 | 283,702 | 0.2 | 0.3 | 302,628 | 0.2 | 0.3 | 119,168 | 0.1 |
| **Age** | | | | | | | | | | |
| 16–17 | 15,317 | 0.2 | 4,831 | 0.1 | 0.8 | 9,955 | 0.1 | 0.3 | 5,680 | 0.1 |
| 18–24 | 151,852 | 0.5 | 58,300 | 0.2 | 0.4 | 113,304 | 0.4 | 0.5 | 40,300 | 0.1 |
| 25–34 | 259,485 | 0.6 | 131,486 | 0.3 | 0.4 | 168,559 | 0.4 | 0.4 | 66,310 | 0.2 |
| 35–49 | 338,604 | 0.5 | 199,821 | 0.3 | 0.4 | 207,061 | 0.3 | 0.4 | 78,638 | 0.1 |
| 50–64 | 330,527 | 0.5 | 221,219 | 0.3 | 0.4 | 177,204 | 0.3 | 0.3 | 75,739 | 0.1 |
| 65 or older | 194,365 | 0.4 | 145,410 | 0.3 | 0.4 | 85,034 | 0.2 | 0.2 | 47,176 | 0.1 |
| **Race/Hispanic origin** | | | | | | | | | | |
| White | 623,114 | 0.4 | 397,484 | 0.2 | 0.3 | 355,777 | 0.2 | 0.2 | 129,204 | 0.1 |
| Black | 153,735 | 0.5 | 54,934 | 0.2 | 0.4 | 110,054 | 0.4 | 0.5 | 61,572 | 0.2 |
| Hispanic/Latino | 157,099 | 0.5 | 76,471 | 0.2 | 0.4 | 105,050 | 0.3 | 0.4 | 49,389 | 0.2 |
| Other race | 105,629 | 0.7 | 77,875 | 0.6 | 0.7 | 55,086 | 0.4 | 0.5 | 19,568 | 0.1 |
| Two or more races | 51,382 | 1.5 | 28,387 | 0.9 | 1.5 | 33,337 | 1.0 | 1.2 | 18,313 | 0.6 |
| **Household income** | | | | | | | | | | |
| $24,999 or less | 179,393 | 0.4 | 66,983 | 0.2 | 0.4 | 123,421 | 0.3 | 0.4 | 67,615 | 0.2 |
| $25,000–$49,999 | 233,453 | 0.4 | 120,182 | 0.2 | 0.3 | 153,467 | 0.3 | 0.3 | 70,047 | 0.1 |
| $50,000–$74,999 | 221,677 | 0.6 | 124,607 | 0.4 | 0.4 | 140,705 | 0.4 | 0.4 | 49,998 | 0.1 |
| $75,000 or more | 398,169 | 0.6 | 278,794 | 0.4 | 0.5 | 209,698 | 0.3 | 0.3 | 68,294 | 0.1 |
| Unknown | 244,419 | 0.4 | 154,516 | 0.3 | 0.4 | 134,298 | 0.2 | 0.3 | 56,601 | 0.1 |

Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 3**
**Ways that victims discovered identity theft, by type of theft, 2012**

| | Any identity theft | | Existing account misuse | | Other identity theft[a] | |
|---|---|---|---|---|---|---|
| | Percent | Standard error | Percent | Standard error | Percent | Standard error |
| Contacted by financial institution about suspicious activity | 42.1% | 1.7% | 45.2% | 1.8% | 15.2% | 2.5% |
| Noticed fraudulent charges on account | 18.6 | 1.2 | 19.8 | 1.3 | 7.5 | 1.8 |
| Noticed money missing from account | 9.9 | 0.9 | 10.5 | 0.9 | 4.6 | 1.3 |
| Notified by a company or agency | 6.4 | 0.7 | 4.7 | 0.6 | 20.9 | 2.9 |
| Contacted financial institution to report a theft | 5.5 | 0.6 | 5.7 | 0.7 | 3.3 | 1.1 |
| Credit card declined, check bounced, or account closed due to insufficient funds | 5.0 | 0.6 | 5.4 | 0.6 | 1.6 | 0.7 |
| Received a bill or contacted about an unpaid bill | 4.3 | 0.5 | 3.3 | 0.5 | 13.4 | 2.4 |
| Notified by a known person | 1.3 | 0.3 | 1.0 | 0.2 | 4.5 | 1.3 |
| Discovered through credit report or credit monitoring service | 1.3 | 0.3 | 0.9 | 0.2 | 4.8 | 1.4 |
| Problems applying for a loan, government benefits or with income taxes | 1.2 | 0.3 | 0.1 | 0.1 | 10.7 | 2.1 |
| Notified by police | 0.8 | 0.2 | 0.3 | 0.1 | 5.7 | 1.5 |
| Received merchandise or a card that the victim did not order or did not receive a product the victim had ordered | 0.7 | 0.2 | 0.5 | 0.2 | 1.9 ! | 0.8 |
| Another way[b] | 2.8 | 0.4 | 2.4 | 0.4 | 5.9 | 1.5 |

Note: Estimates are based on the most recent identity theft incident.
! Estimate based on 10 or fewer sample cases, or coefficient of variation is greater than 50%.
[a]Includes incidents involving the use of personal information to open a new account or for other fraudulent purposes.
[b]Victim noticed suspicious phishing activity, hacked computer, account information missing or stolen, or discovered the theft by accident.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 4**
**Estimates and standard errors for figure 3: Identity theft victims who knew how their personal information was obtained, by type of theft, 2012**

| Type of identity theft | Estimate | Standard error |
|---|---|---|
| Total | 32.0% | 1.6% |
| Existing credit card account | 24.4 | 1.9 |
| Exisiting bank account | 35.4 | 2.3 |
| Other existing account | 39.0 | 4.3 |
| New account | 36.7 | 5.2 |
| Personal information | 33.4 | 5.2 |
| Multiple types* | 46.5 | 4.3 |

*Includes victims who experienced more than one type of identity theft in a single incident.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 5**
**Standard errors for table 3: Identity theft victims who knew something about the offender, by type of theft, 2012**

| Type of identity theft | Victim knew something about the offender |
|---|---|
| **Total** | 0.8% |
| **Existing account** | 0.7 |
| Credit card | 0.6 |
| Bank | 1.2 |
| Other | 3.0 |
| **New account** | 4.5 |
| **Personal information** | 4.6 |
| **Multiple types** | 2.8 |
| Existing account | 2.9 |
| Other | 5.4 |

Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 6**
**Standard errors for table 4: Mean losses attributed to identity theft and property crime, 2012**

|  | Mean |
|---|---|
| Identity theft | $3,404 |
| Property crime | $1,621 |
|    Burglary | 2,630 |
|    Motor vehicle theft | 4,881 |
|    Theft | 1,129 |

Note: Standard errors for median and total losses were not calculated.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2012, and National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 7**
**Estimates and standard errors for figure 4: Total out-of-pocket loss for identity theft victims experiencing a loss of $1 or more, 2012**

|  | Percent of victims | |
|---|---|---|
| Total out-of-pocket loss | Estimate | Standard error |
| $99 or less | 48.8% | 3.5% |
| $100–$249 | 17.9 | 2.5 |
| $250–$499 | 8.4 | 1.7 |
| $500–$999 | 8.5 | 1.7 |
| $1,000–$2,499 | 9.9 | 1.8 |
| $2,500–$4,999 | 3.1 | 1.0 |
| $5,000 or more | 3.4 | 1.0 |

Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 8**
**Financial loss among victims who experienced at least one attempted or successful identity theft incident during the previous 12 months, by type of theft and type of loss, 2012**

|  | Total identity theft | Existing account | | | | New account | Personal information | Multiple types | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Total | Credit card | Bank | Other |  |  | Total | Existing account | Other |
| Total number of victims | 16,580,500 | 14,022,100 | 6,676,300 | 6,191,500 | 1,154,300 | 683,400 | 622,900 | 1,252,000 | 824,700 | 427,400 |
| **Combined direct and indirect loss** |  |  |  |  |  |  |  |  |  |  |
|   Mean | $1,769 | $1,008 | $1,435 | $580 | $1,027 | $6,510 | $21,804 | $3,187 | $2,772 | $3,974 |
|   Median | $300 | $200 | $300 | $200 | $200 | $500 | $1,500 | $400 | $350 | $600 |
|   Percent experiencing a loss | 67.5 | 69.7 | 68.7 | 74.3 | 50.9 | 46.2 | 37.9 | 68.8 | 68.4 | 69.5 |
| **Direct loss** |  |  |  |  |  |  |  |  |  |  |
|   Mean | $1,409 | $1,003 | $1,448 | $551 | $1,057 | $7,135 | $9,650 | $2,140 | $1,161 | $4,119 |
|   Median | $300 | $200 | $300 | $200 | $200 | $600 | $1,900 | $400 | $300 | $600 |
|   Percent experiencing a loss | 66.4 | 69.0 | 68.1 | 73.7 | 48.6 | 42.2 | 32.5 | 67.3 | 68.3 | 65.2 |
| **Direct out-of-pocket loss** |  |  |  |  |  |  |  |  |  |  |
|   Mean | $4,313 | $2,188 | $4,176 | $1,754 | $1,600 | $1,598 | $19,463 | $8,464 | $3,691 | $14,335 |
|   Median | $200 | $100 | $200 | $100 | $100 | $1,000 | $1,800 | $200 | $100 | $300 |
|   Percent experiencing a loss | 9.0 | 7.7 | 3.1 | 11.5 | 14.4 | 8.9 | 15.0 | 20.0 | 16.8 | 26.3 |
| **Indirect loss** |  |  |  |  |  |  |  |  |  |  |
|   Mean | $4,168 | $257 | $39 | $434 | $133 | $75 | $37,797 | $5,901 | $14,327 | $338 |
|   Median | $30 | $10 | $10 | $20 | $10 | $40 | $400 | $90 | $50 | $100 |
|   Percent experiencing a loss | 6.3 | 5.2 | 4.0 | 6.2 | 6.7 | 10.1 | 13.6 | 12.9 | 7.8 | 22.8 |
| **Total out-of-pocket loss** |  |  |  |  |  |  |  |  |  |  |
|   Mean | $4,804 | $1,565 | $1,991 | $1,444 | $1,264 | $863 | $34,352 | $9,001 | $8,572 | $9,409 |
|   Median | $100 | $80 | $40 | $90 | $70 | $300 | $700 | $200 | $60 | $200 |
|   Percent experiencing a loss | 13.5 | 11.6 | 6.5 | 15.8 | 19.0 | 17.4 | 23.4 | 27.3 | 20.2 | 40.9 |

Note: See appendix table 9 for standard errors.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 9**
**Standard errors for appendix table 8: Financial loss among victims who experienced at least one attempted or successful identity theft incident during the previous 12 months, by type of theft and type of loss, 2012**

| | Total identity theft | Existing account | | | | New account | Personal information | Multiple types | | |
| | | Total | Credit card | Bank | Other | | | Total | Existing account | Other |
|---|---|---|---|---|---|---|---|---|---|---|
| Total number of victims | 750,223 | 673,954 | 414,852 | 394,659 | 129,787 | 92,348 | 87,000 | 136,881 | 104,263 | 68,425 |
| **Combined direct and indirect loss** | | | | | | | | | | |
| Mean | $3,051 | $2,281 | $2,737 | $1,718 | $2,303 | $6,057 | $11,700 | $4,149 | $3,856 | $4,660 |
| Percent experiencing a loss | 1.7 | 1.8 | 2.3 | 2.2 | 4.5 | 5.4 | 5.4 | 4.1 | 4.8 | 6.2 |
| **Direct loss** | | | | | | | | | | |
| Mean | $2,712 | $2,275 | $2,750 | $1,674 | $2,338 | $6,361 | $7,484 | $3,369 | $2,454 | $4,749 |
| Percent experiencing a loss | 1.7 | 1.8 | 2.3 | 2.2 | 4.5 | 5.4 | 5.2 | 4.1 | 4.8 | 6.4 |
| **Direct out-of-pocket loss** | | | | | | | | | | |
| Mean | $4,866 | $3,408 | $4,784 | $3,037 | $2,896 | $2,894 | $10,985 | $6,973 | $4,482 | $9,283 |
| Percent experiencing a loss | 0.8 | 0.8 | 0.6 | 1.3 | 2.9 | 2.8 | 3.8 | 3.2 | 3.5 | 5.6 |
| **Indirect loss** | | | | | | | | | | |
| Mean | $4,779 | $1,134 | $438 | $1,482 | $814 | $606 | $15,942 | $5,747 | $9,280 | $1,304 |
| Percent experiencing a loss | 0.7 | 0.6 | 0.7 | 1.0 | 2.0 | 3.0 | 3.6 | 2.6 | 2.4 | 5.3 |
| **Total out-of-pocket loss** | | | | | | | | | | |
| Mean | $5,152 | $2,863 | $3,244 | $2,745 | $2,563 | $2,106 | $15,101 | $7,208 | $7,021 | $7,382 |
| Percent experiencing a loss | 1.0 | 1.0 | 1.0 | 1.6 | 3.3 | 3.9 | 4.6 | 3.7 | 3.9 | 6.4 |

Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 10**
**Estimates and standard errors for figure 5: Victims who experienced financial or legal problems as a result of identity theft, by type of theft, 2012**

| | Estimates | | | Standard errors | | |
| Type of problems experienced | Any identity theft | Existing account misuse | Other identity theft[a] | Any identity theft | Existing account misuse | Other identity theft[a] |
|---|---|---|---|---|---|---|
| Credit-related problems[b] | 2.6% | 1.6% | 11.6% | 0.4% | 0.3% | 2.2% |
| Banking problems[c] | 2.1 | 1.6 | 6.7 | 0.4 | 0.3 | 1.6 |
| Problems with debt collectors | 3.3 | 1.7 | 16.7 | 0.5 | 0.3 | 2.6 |
| Utilities cut off or new service denied | 0.6 | 0.5 | 1.7 ! | 0.2 | 0.2 | 0.8 |
| Legal problems[d] | 0.5 | 0.2 ! | 2.9 | 0.2 | 0.1 | 1.1 |
| Other problems[e] | 0.5 | 0.3 | 2.6 | 0.2 | 0.1 | 1.0 |

Note: Estimates are based on the most recent identity theft incident.
! Interpret estimate with caution; estimate is based on 10 or fewer sample cases or coefficient of variation is greater than 50%.
[a]Includes identity theft incidents involving the misuse of personal information to open a new account or for other fraudulent purposes.
[b]Includes problems such as having to correct the same information on a credit report repeatedly, being turned down for credit or loans, or paying higher interest rates.
[c]Includes problems such as being turned down for a checking account or having checks bounce.
[d]Includes being the subject of a lawsuit or other criminal proceedings, or being arrested.
[e]Includes problems such as being turned down for or losing a job or problems with income taxes.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 11**

**Identity theft and violent crime victims who experienced emotional distress, by type of identity theft or violent crime, 2012**

| | Total number of victims | Significant work- or school-related problems[a] | Significant family or friend relationship problems[b] | Distress related to crime | | | |
|---|---|---|---|---|---|---|---|
| | | | | None | Mild | Moderate | Severe |
| **Total identity theft** | 16,580,500 | 1.5% | 3.7% | 20.7% | 42.7% | 26.2% | 10.5% |
| Existing account misuse | 14,022,100 | 0.9 | 2.9 | 21.9 | 44.2 | 25.5 | 8.3 |
| Credit card | 6,676,300 | 0.5 | 1.6 | 25.6 | 46.7 | 22.4 | 5.3 |
| Bank | 6,191,500 | 1.1 | 3.7 | 18.2 | 42.1 | 28.3 | 11.4 |
| Other | 1,154,300 | 1.8 ! | 5.9 | 21.1 | 41.6 | 28.4 | 8.9 |
| New account | 683,400 | 6.1 ! | 10.1 | 14.3 | 33.9 | 30.2 | 21.7 |
| Personal information | 622,900 | 5.2 ! | 10.4 | 16.4 | 27.2 | 24.6 | 31.8 |
| Multiple types | 1,252,000 | 3.9 | 5.9 | 12.1 | 38.0 | 32.2 | 17.7 |
| Existing account[c] | 824,666 | 3.7 ! | 5.5 | 16.2 | 41.2 | 31.3 | 11.3 |
| Other[d] | 427,371 | 4.3 ! | 6.6 ! | 4.3 ! | 31.8 | 33.8 | 30.1 |
| **Total violent victimization** | 5,901,100 | 12.3% | 18.9% | 19.0% | 29.7% | 22.6% | 28.8% |
| Rape/sexual assault | 316,700 | 27.5 | 28.8 | 24.2 ! | 16.4 | 17.5 | 41.9 |
| Robbery | 695,400 | 14.0 | 27.0 | 13.0 | 20.8 | 26.0 | 40.1 |
| Aggravated assault | 892,900 | 9.8 | 12.8 | 19.2 | 24.0 | 30.3 | 26.5 |
| Simple assault | 3,996,100 | 11.4 | 18.1 | 19.5 | 33.7 | 20.7 | 26.0 |

Note: Estimates are based on the most recent identity theft incident. See appendix table 12 for standard errors.
! Interpret with caution; estimates based on 10 or fewer sample cases, or the coefficient of variation is greater than 50%.
[a]Includes victims reporting significant problems with job or school, such as trouble with boss, coworker, or peers.
[b]Includes victims reporting significant problems with family members or friends, including getting into more arguments or fights than before, not feeling able to trust them as much, or not feeling as close to them as before the crime.
[c]Includes victims who experienced two or more of the following: unauthorized use of a credit card, banking account, or other existing account.
[d]Includes victims who experienced two or more of the following: use of an existing account, misuse of personal information to open a new account, or misuse of personal information of other fraudulent purposes.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, 2012 and National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 12**

**Standard errors for appendix table 11: Identity theft and violent crime victims who experienced emotional distress, by type of identity theft or violent crime, 2012**

| | Total number of victims | Significant work- or school-related problems | Significant family or friend relationship problems | Distress related to crime | | | |
|---|---|---|---|---|---|---|---|
| | | | | None | Mild | Moderate | Severe |
| **Total identity theft** | 750,223 | 0.3% | 0.5% | 1.3% | 1.7% | 1.5% | 0.9% |
| Existing account misuse | 673,954 | 0.2 | 0.5 | 1.4 | 1.8 | 1.5 | 0.8 |
| Credit card | 414,852 | 0.2 | 0.4 | 1.9 | 2.4 | 1.8 | 0.8 |
| Bank | 394,659 | 0.4 | 0.7 | 1.7 | 2.4 | 2.1 | 1.3 |
| Other | 129,787 | 1.0 | 1.8 | 3.4 | 4.3 | 3.9 | 2.3 |
| New account | 92,348 | 2.3 | 3.0 | 3.6 | 5.1 | 4.9 | 4.3 |
| Personal information | 87,000 | 2.2 | 3.2 | 3.9 | 4.9 | 4.7 | 5.2 |
| Multiple types | 136,881 | 1.4 | 1.8 | 2.6 | 4.1 | 3.9 | 3.1 |
| Existing account | 104,263 | 1.6 | 2.0 | 3.5 | 4.9 | 4.6 | 2.9 |
| Other | 68,425 | 2.4 | 3.0 | 2.4 | 6.0 | 6.1 | 5.9 |
| **Total violent victimization** | 355,502 | 1.3% | 1.6% | 1.6% | 2.0% | 1.8% | 2.0% |
| Rape/sexual assault | 51,953 | 5.9 | 6.0 | 5.6 | 4.8 | 4.9 | 6.7 |
| Robbery | 85,975 | 3.2 | 4.2 | 3.1 | 3.8 | 4.2 | 4.8 |
| Aggravated assault | 101,200 | 2.4 | 2.7 | 3.3 | 3.7 | 4.0 | 3.8 |
| Simple assault | 273,940 | 1.4 | 1.8 | 1.9 | 2.4 | 1.9 | 2.2 |

Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 13**
**Identity theft victims who resolved associated problems and length of time spent resolving problems, 2012**

| Time to resolve | Total identity theft | Existing account | | | | New account | Personal information | Multiple types | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Credit card | Bank | Other | | | Total | Existing account | Other |
| **Victim resolved problems associated with theft** | | | | | | | | | | |
| No | 8.8% | 6.4% | 4.7% | 7.0% | 13.2% | 25.7% | 34.2% | 13.5% | 9.7% | 20.8% |
| Yes | 86.2 | 89.7 | 91.7 | 89.4 | 79.6 | 57.0 | 45.7 | 83.3 | 88.5 | 73.3 |
|    Length of time to resolve problems | | | | | | | | | | |
|       1 day or less | 52.3 | 54.2 | 60.9 | 46.1 | 57.7 | 41.9 | 42.8 | 36.4 | 42.4 | 22.6 |
|       2 to 7 days | 19.3 | 19.0 | 17.7 | 20.7 | 17.6 | 17.3 | 14.4 | 24.4 | 24.2 | 25.1 |
|       8 days to less than 1 month | 17.7 | 17.6 | 12.5 | 23.9 | 13.4 | 15.9 | 11.5 | 21.2 | 22.4 | 18.6 |
|       1 month to less than 3 months | 7.3 | 6.6 | 6.2 | 7.0 | 7.4 | 9.4 | 14.4 | 12.1 | 7.5 | 22.9 |
|       3 months to less than 6 months | 2.1 | 1.5 | 1.5 | 1.3 | 2.7 | 10.8 | 8.0 | 3.6 | 3.1 ! | 4.9 ! |
|       6 months or more | 0.8 | 0.5 | 0.3 | 0.6 | 1.2 | 3.7 | 6.1 | 2.2 | 0.5 ! | 4.9 ! |
|       Unknown length of time | 0.5 | 0.5 | 0.8 | 0.3 | -- | 1.0 | 2.8 | -- ! | -- ! | -- ! |
| Do not know | 5.0% | 3.9% | 3.6% | 3.6% | 7.2% | 17.3% | 20.1% | 3.2% | 1.8% ! | 5.9% ! |

Note: Estimates are based on the most recent identity theft incident. Detail may not sum to total due to rounding. See appendix table 14 for standard errors.
--Less than 0.05%.
! Interpret estimate with caution; estimate based on 10 or fewer sample cases, or coefficient or variation greater than 50%.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 14**
**Standard errors for appendix table 13: Identity theft victims who resolved associated problems and length of time spent resolving problems, 2012**

| Time to resolve | Total identity theft | Existing account | | | | New account | Personal information | Multiple types | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Credit card | Bank | Other | | | Total | Existing account | Other |
| **Victim resolved problems associated with theft** | | | | | | | | | | |
| No | 0.8% | 0.7% | 0.8% | 1.0% | 2.8% | 4.6% | 5.3% | 2.7% | 2.7% | 5.1% |
| Yes | 1.3 | 1.2 | 1.4 | 1.6 | 3.7 | 5.5 | 5.6 | 3.3 | 3.4 | 6.0 |
|    Length of time to resolve problems | | | | | | | | | | |
|       1 day or less | 1.9 | 2.0 | 2.4 | 2.5 | 4.9 | 6.7 | 7.7 | 4.4 | 5.2 | 6.1 |
|       2 to 7 days | 1.3 | 1.4 | 1.7 | 1.9 | 3.5 | 4.9 | 5.2 | 3.8 | 4.4 | 6.3 |
|       8 days to less than 1 month | 1.3 | 1.3 | 1.4 | 2.0 | 3.0 | 4.8 | 4.7 | 3.6 | 4.2 | 5.6 |
|       1 month to less than 3 months | 0.8 | 0.8 | 1.0 | 1.1 | 2.3 | 3.7 | 5.2 | 2.8 | 2.5 | 6.1 |
|       3 months to less than 6 months | 0.4 | 0.3 | 0.4 | 0.4 | 1.3 | 4.0 | 3.9 | 1.5 | 1.6 | 2.9 |
|       6 months or more | 0.2 | 0.2 | 0.2 | 0.3 | 0.9 | 2.3 | 3.4 | 1.1 | 0.6 | 2.9 |
|       Unknown length of time | 0.2 | 0.2 | 0.3 | 0.2 | -- | 1.2 | 2.3 | -- | -- | -- |
| Do not know | 0.6 | 0.5 | 0.7 | 0.7 | 2.0 | 3.9 | 4.3 | 1.3 | 1.1 | 2.8 |

--Less than 0.05%.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 15**

**Standard errors for table 5: Persons age 16 or older who experienced identity theft at any point in their lives, type of identity theft they experienced outside of the past year, and ongoing problems from identity theft that occurred outside of the past year, 2012**

| | Number of persons | Percent of all persons | Percent with unresolved problems resulting from identity theft |
|---|---|---|---|
| Experienced at least one incident of identity theft during lifetime | | | |
| No | 1,538,646 | 0.6% | ~ |
| Yes | 1,170,040 | 0.5 | 0.6% |
| Experienced at least one incident of identity theft outside of past 12 months | | | |
| No | 1,247,612 | 0.5% | 0.1% |
| Yes | 853,299 | 0.3 | 0.7 |
| Type of identity theft experienced | | | |
| Existing account | 713,065 | 0.3 | 0.5 |
| Credit card | 499,949 | 0.2 | 0.5 |
| Bank account | 374,551 | 0.2 | 1.0 |
| Other account | 96,275 | -- | 2.5 |
| New account | 159,840 | 0.1 | 2.7 |
| Personal information | 183,122 | 0.1 | 2.4 |
| Multiple types | 150,748 | 0.1 | 3.1 |
| Existing accounts | 82,447 | -- | 3.4 |
| Other | 108,544 | -- | 4.2 |

~Not applicable.
--Less than 0.05%.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 16**

**Estimates and standard errors for figure 9: Identity theft victims who reported work/school or relationship problems or distress, by length of time spent resolving associated financial and credit problems, 2012**

| Time spent resolving problems due to identity theft | Work/school problems[a] | | Family/friend relationship problems[b] | | Feelings that incident was severely distressing | |
|---|---|---|---|---|---|---|
| | Estimate | Standard error | Estimate | Standard error | Estimate | Standard error |
| 1 day or less | 0.4% | 0.2% | 1.6% | 0.4% | 3.9% | 0.7% |
| 2 to 7 days | 0.5 | 0.3 | 2.4 | 0.8 | 7.2 | 1.4 |
| 8 days to less than 1 month | 1.4 | 0.6 | 4.6 | 1.1 | 13.6 | 2.0 |
| 1 to less than 3 months | 2.7 | 1.3 | 1.8 | 1.0 | 18.4 | 3.4 |
| 3 to less than 6 months | 1.4 | 1.6 | 14.1 | 5.1 | 34.3 | 7.2 |
| 6 months or more | 3.0 | 3.6 | 14.4 | 7.7 | 46.6 | 11.4 |

[a]Includes victims reporting significant problems with job or school, such as trouble with boss, coworker, or peers.
[b]Includes victims reporting significant problems with family members or friends, including getting into more arguments or fights than before, not feeling able to trust them as much, or not feeling as close to them as before the crime.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 17**
**Victims who did and did not report identity theft to police, by type of theft and reason for not reporting, 2012**

| Victim response | Total identity theft | Existing account | | | | New account | Personal information | Multiple types | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Credit card | Bank | Other | | | Total | Existing account[a] | Other[b] |
| Reported to police | 9.3% | 6.2% | 3.7% | 8.8% | 5.8% | 23.0% | 39.5% | 21.8% | 17.0% | 31.1% |
| Did not report to police | 90.5 | 93.7 | 96.1 | 90.9 | 94.2 | 76.5 | 59.9 | 77.6 | 82.5 | 68.0 |
| Reasons for not reporting | | | | | | | | | | |
| Did not know to report[c] | 15.2 | 15.0 | 14.4 | 15.4 | 16.5 | 14.1 | 23.2 | 15.0 | 15.8 | 13.2 |
| No monetary loss | 28.9 | 29.9 | 32.6 | 26.6 | 30.4 | 21.4 | 20.4 | 23.4 | 23.4 | 23.3 |
| Handled it another way[d] | 57.9 | 59.2 | 59.8 | 59.8 | 52.1 | 47.0 | 34.0 | 55.8 | 59.0 | 48.4 |
| Did not think the police could help[e] | 20.2 | 19.5 | 18.4 | 18.9 | 29.3 | 25.2 | 21.2 | 25.9 | 23.5 | 31.6 |
| Offender was a family member or friend | 1.5 | 1.2 | 0.3 ! | 1.5 | 4.1 ! | 6.6 ! | 2.6 ! | 2.5 ! | 2.6 ! | 2.2 ! |
| Personal reasons[f] | 3.3 | 3.0 | 2.9 | 3.0 | 3.1 ! | 4.7 ! | 10.3 ! | 4.9 | 2.9 ! | 9.8 ! |
| Location of the theft[g] | 1.3 | 1.4 | 1.6 | 1.0 | 2.0 ! | 0.9 ! | -- ! | 1.0 ! | 0.9 ! | 1.2 ! |
| Other[h] | 1.3 | 0.7 | 0.7 | 0.7 | 1.1 ! | 5.0 ! | 12.7 | 2.5 ! | 1.3 ! | 5.5 ! |

Note: Estimates are based on the most recent identity theft incident. Detail may not sum to total due to victims who reported multiple reasons for not contacting police. See appendix table 18 for standard errors.
--Less than 0.05%.
! Estimate based on 10 or fewer sample cases, or coefficient of variation is greater than 50%.
[a]Includes victims who experienced two or more of the following: the unauthorized use of a credit card, bank account, or other existing account.
[b]Includes victims who experienced two or more of the following: unauthorized use of an existing account, misuse of personal information to open a new account, or misuse of personal information for other fraudulent purposes.
[c]Includes victims who did not know they could report the incident and victims who did not know what agency was responsible for identity theft crimes.
[d]Includes victims who reported the incident to another organization, such as a credit card company; victims who took care of it themselves; victims who reported that the credit card company, bank, or other organization took care of the problem; victims who reported a family member took care of the problem; and victims who thought the credit card company, bank, or other organization would handle the problem.
[e]Includes victims who didn't think the police would do anything, victims who didn't want to bother the police, victims who thought it was too late for the police to help, and victims who couldn't identify the offender or provide much information to the police.
[f]Includes victims who were afraid to report the incident, victims who were embarrassed, victims who thought it was too inconvenient, and victims who didn't want to think about the incident.
[g]Includes victims of identity theft that occurred out of state or outside of the United States.
[h]Includes victims who reported that the identity theft just occurred or is still ongoing and plan to report soon, victims who were not sure it was a crime, victims who were contacted by law enforcement, and victims who did not report for other reasons.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 18**
**Standard errors for table 17: Victims who did and did not report identity theft to police, by type of theft and reason for not reporting, 2012**

| Victim response | Total identity theft | Existing account | | | | New account | Personal information | Multiple types | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Credit card | Banking | Other | | | Total | Existing account | Other |
| Reported to police | 0.8% | 0.7% | 0.7% | 1.2% | 1.8% | 4.4% | 5.5% | 3.4% | 3.6% | 6.0% |
| Did not report to police | 1.1 | 1.0 | 1.0 | 1.5 | 2.2 | 4.8 | 5.6 | 3.7 | 4.0 | 6.3 |
| Reasons for not reporting | | | | | | | | | | |
| Did not know to report | 1.2 | 1.2 | 1.5 | 1.6 | 3.1 | 4.0 | 5.7 | 3.1 | 3.7 | 5.0 |
| No monetary loss | 1.6 | 1.7 | 2.2 | 2.1 | 4.1 | 4.8 | 5.4 | 3.8 | 4.4 | 6.4 |
| Handled it another way | 1.9 | 1.9 | 2.4 | 2.5 | 4.6 | 6.1 | 6.5 | 4.8 | 5.4 | 7.8 |
| Did not think the police could help | 1.3 | 1.4 | 1.7 | 1.8 | 4.0 | 5.1 | 5.5 | 4.0 | 4.4 | 7.1 |
| Offender was a family member or friend | 0.3 | 0.3 | 0.2 | 0.4 | 1.5 | 2.7 | 2.0 | 1.2 | 1.5 | 2.0 |
| Personal reasons | 0.5 | 0.5 | 0.6 | 0.7 | 1.3 | 2.3 | 3.9 | 1.8 | 1.6 | 4.3 |
| Location of the theft | 0.3 | 0.3 | 0.4 | 0.3 | 1.0 | 1.0 | -- | 0.8 | 0.9 | 1.5 |
| Other | 0.3 | 0.2 | 0.3 | 0.3 | 0.8 | 2.4 | 4.4 | 1.3 | 1.0 | 3.2 |

--Less than 0.05%.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 19**
**Identity theft victims who contacted an organization, by type of theft, type of organization, and credit bureau action, 2012**

| Organization | Total identity theft | Existing account | | | | New account | Personal information | Multiple types | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Credit card | Bank | Other | | | Total | Existing account[a] | Other[b] |
| **Percent organization** | | | | | | | | | | |
| Credit card company or bank | 86.0% | 89.6% | 93.8% | 93.0% | 46.7% | 64.8% | 26.4% | 86.9% | 92.0% | 77.2% |
| Federal Trade Commission (FTC) | 1.0 | 0.4 | 0.4 ! | 0.1 ! | 1.6 ! | 4.9 ! | 5.0 ! | 4.4 | 1.6 ! | 9.7 ! |
| Consumer agency[c] | 0.9 | 0.6 | 0.3 ! | 0.6 | 2.0 ! | 3.8 ! | 1.7 ! | 1.8 ! | 1.3 ! | 2.6 ! |
| Document issuing agency[d] | 2.7 | 1.2 | 1.2 | 1.3 | 1.0 ! | 5.2 ! | 21.3 | 8.8 | 8.9 | 8.4 ! |
| Credit monitoring service | 5.8 | 4.2 | 4.5 | 3.7 | 4.3 | 16.0 | 11.8 | 15.4 | 12.9 | 20.4 |
| Credit bureau[e] | 8.7 | 6.2 | 6.4 | 5.7 | 7.6 | 30.0 | 19.3 | 20.2 | 11.0 | 38.0 |
| **Percent credit bureau** | | | | | | | | | | |
| Placed a fraud alert on their credit report | 69.8 | 63.5 | 57.7 | 71.9 | 57.6 | 81.6 | 81.4 | 76.1 | 82.6 | 72.5 |
| Requested a credit report | 65.6 | 59.8 | 52.9 | 63.8 | 77.0 | 79.7 | 80.5 | 66.9 | 59.1 | 71.2 |
| Requested corrections to their credit report | 41.2 | 36.9 | 35.1 | 39.7 | 33.9 ! | 63.7 | 26.9 ! | 44.5 | 41.8 ! | 46.0 |
| Provided a police report to the credit bureau | 18.5 | 12.0 | 9.7 | 15.5 | 9.6 ! | 27.6 | 30.3 ! | 27.3 | 25.7 ! | 28.2 |
| Placed a freeze on their credit report | 37.8 | 35.1 | 27.4 | 45.2 | 32.2 ! | 45.4 | 28.9 ! | 45.2 | 53.4 | 40.6 |

Note: Estimates are based on the most recent identity theft incident. See appendix table 20 for standard errors.
[a]Includes victims who experienced two or more of the following: the unauthorized use of a credit card, bank account, or other existing account.
[b]Includes victims who experienced two or more of the following: the unauthorized use of an existing account, misuse of personal information to open a new account, or misuse of personal information for other fraudulent purposes.
[c]Includes government consumer affairs agencies and agencies such as the Better Business Bureau.
[d]Includes agencies that issue drivers' licenses or Social Security cards.
[e]Percent of victims who took actions with a credit bureau, based on the number of victims who contacted a credit bureau. Details may sum to more than 100% because some respondents took multiple actions with the credit bureau.
! Interpret with caution;  estimates based on 10 or fewer sample cases or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 20**
**Standard errors for appendix table 19: Identity theft victims who contacted an organization, by type of theft, type of organization, and credit bureau action, 2012**

| Organization | Total identity theft | Existing account | | | | New account | Personal information | Multiple types | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Credit card | Bank | Other | | | Total | Existing account | Other |
| **Percent organization** | | | | | | | | | | |
| Credit card company or bank | 1.3% | 1.2% | 1.2% | 1.3% | 4.4% | 5.3% | 4.8% | 3.0% | 2.9% | 5.7% |
| Federal Trade Commission (FTC) | 0.2 | 0.1 | 0.2 | 0.1 | 0.9 | 2.1 | 2.2 | 1.5 | 1.1 | 3.6 |
| Consumer agency | 0.2 | 0.2 | 0.2 | 0.3 | 1.0 | 1.8 | 1.2 | 0.9 | 1.0 | 1.8 |
| Document issuing agency | 0.4 | 0.3 | 0.4 | 0.4 | 0.7 | 2.1 | 4.4 | 2.2 | 2.6 | 3.4 |
| Credit monitoring service | 0.6 | 0.6 | 0.8 | 0.7 | 1.5 | 3.8 | 3.4 | 2.9 | 3.1 | 5.1 |
| Credit bureau | 0.8 | 0.7 | 0.9 | 0.9 | 2.1 | 4.9 | 4.2 | 3.3 | 2.9 | 6.3 |
| **Percent credit bureau** | | | | | | | | | | |
| Placed a fraud alert on their credit report | 3.9 | 4.9 | 6.6 | 6.6 | 13.0 | 7.1 | 9.0 | 7.2 | 9.9 | 9.0 |
| Requested a credit report | 4.0 | 5.0 | 6.6 | 7.0 | 11.2 | 7.4 | 9.2 | 7.9 | 12.8 | 9.2 |
| Requested corrections to their credit report | 4.0 | 4.7 | 6.2 | 7.0 | 12.3 | 8.8 | 9.9 | 8.2 | 12.7 | 9.9 |
| Provided a police report to the credit bureau | 3.0 | 3.0 | 3.6 | 4.9 | 7.4 | 7.9 | 10.3 | 7.2 | 11.1 | 8.8 |
| Placed a freeze on their credit report | 3.9 | 4.7 | 5.7 | 7.1 | 12.1 | 8.9 | 10.2 | 8.2 | 12.9 | 9.7 |

Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.

**APPENDIX TABLE 21**
**Standard errors for table 6: Actions victims and nonvictims took during the past 12 months to reduce the risk of identity theft, by whether the action was taken in response to the theft, 2012**

| Type of action | Percent of persons age 16 or older | | | | |
|---|---|---|---|---|---|
| | Total | Nonvictims | Victim during prior 12 months | | |
| | | | Total | Action taken in response to identity theft | Action taken independently of identity theft in past year |
| Any | 0.6% | 0.7% | 0.7% | 1.0% | 1.4% |
| Checked credit report | 0.8 | 0.8 | 1.8 | 1.1 | 1.7 |
| Changed passwords on financial accounts | 0.7 | 0.7 | 1.8 | 1.4 | 1.6 |
| Purchased identity theft insurance/credit monitoring service | 0.3 | 0.3 | 1.0 | 0.6 | 0.7 |
| Shredded/destroyed documents with personal information | 0.8 | 0.8 | 1.5 | 1.0 | 1.7 |
| Checked bank or credit statements | 0.8 | 0.8 | 1.1 | 1.4 | 1.7 |
| Used identity theft security program on computer | 0.5 | 0.5 | 1.4 | 0.6 | 1.2 |
| Purchased identity theft protection | 0.2 | 0.2 | 0.7 | 0.5 | 0.4 |

Source: Bureau of Justice Statistics, National Crime Victimization Survey, Identity Theft Supplement, 2012.



The Bureau of Justice Statistics, located in the Office of Justice Programs, U.S. Department of Justice, collects, analyses, and disseminates statistical information on crime, criminal offenders, victims of crime, and the operation of justice systems at all levels of government. William J. Sabol is acting director.

This report was written by Erika Harrell, Ph.D. and Lynn Langton, Ph.D. Shannan Catalano, Ph.D. verified the report. Agency partners for the Identity Theft Supplement (ITS) included Office for Victims of Crime, National Institute of Justice, and the Federal Trade Commission.

Vanessa Curto and Jill Thomas edited the report, and Barbara Quinn produced the report.

December 2013, NCJ 243779



N C J 2 4 3 7 7 9

**Office of Justice Programs**
**Innovation • Partnerships • Safer Neighborhoods**
**www.ojp.usdoj.gov**

Exhibit H

# JAVELIN

# 2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters

20 February 2013 By: Al Pascual

Identity fraud incidence increased in 2012 for the second consecutive year, affecting 5.26% of U.S. adults. This increase was driven by dramatic jumps in the two most severe fraud types, new account fraud (NAF) and account takeover fraud (ATF). Javelin's "2013 Identity Fraud Report" provides a comprehensive analysis of fraud trends in the context of a changing technological and regulatory environment in order to inform consumers, financial institutions, and businesses on the most effective means of fraud prevention, detection, and resolution. This year, Javelin conducted a thorough exploration of the relationship between the compromise of personal information in a data breach and fraud incidence. This report also expounds current trends in online retail fraud and familiar fraud, and implicates key factors in victims' susceptibility and responses to fraud.

The survey was made possible in part by CitiGroup Inc. and Intersections LLC.  To preserve the project's independence and objectivity, the sponsors of this project were not involved in the tabulation, analysis, or reporting of final results.

**Selected Key Findings**

- **Identity fraud incidents and amount stolen increased**—The number of identity fraud incidents increased by one million more consumers over the past year, and the dollar amount stolen increased to $21 billion, a three-year high but still significantly lower than the all-time high of $47 billion in 2004. This equates to 1 incident of identity fraud every 3 seconds.
- **1 in 4 data breach notification recipients became a victim of identity fraud**—This year, almost 1 in 4 consumers that received a data breach letter became a victim of identity fraud, which is the highest rate since 2010. This underscores the need for consumers to take all notifications seriously. Not all breaches are created equal. The study found consumers who had their Social Security number compromised in a data breach were 5 times more likely to be a fraud victim than an average consumer.
- **Fraudsters misuse information fewer days than before**—Consumer information was misused for an average of 48 days in 2012, down from 55 days in 2011 and 95 days in 2010. Misuse time was down for all types of fraud including fraud on cards, loans, bank accounts, mobile phone bills and other types of fraud due to consumer and industry action.  More than 50 percent of victims were actively detecting fraud using financial alerts, credit monitoring or identity protection services and by monitoring their accounts.
- **Small retailers are losing out**—Fraud victims are more selective where they shop after an incident, and small businesses were the most dramatically impacted. The study found that 15 percent of all fraud victims decided to change behaviors and avoid smaller online merchants. This is a much greater percentage than those that avoid gaming sites or larger retailers.

**Companies Mentioned**

Amazon

MasterCard

American Express

McAfee

Apple

Microsoft

Discover

PayPal

EBay

Target

Europay

Trend Micro

Facebook

Visa

Global Payments

Wal-Mart

Google

Zappo's

Macy's

"2013 Identify Fraud Report" data was gathered by a survey of a representative sample of 5,249 U.S. adults, including 857 consumers who were fraud victims in the past six years. This report has been issued as a longitudinal update to the Javelin 2005, 2006, 2007, 2008, 2009, 2010, 2011 and 2012 identity fraud reports, and the Federal Trade Commission's "2003 Identity Theft Survey" report.

Copyright ©2020 Escalent and/or its affiliates. All rights reserved. No portion of these materials may be copied, reproduced, distributed or transmitted, electronically or otherwise, to external parties or publicly without the permission of Escalent.

javelinstrategy.com                    inquiry@javelinstrategy.com                    925.225.9100

# Exhibit I

**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010
Tel: (213) 381-9988
Fax: (213) 381-9989
wilshirelawfirm.com



Bobby Saadian, Esq. JD/MBA

Colin M. Jones, Esq.              Nicol Hajjar, Esq.
Ilyas Akbari, Esq.               Thiago Coelho, Esq.
Gail Richardson, Esq.             Vy Nguyen, Esq.
Justin F. Marquez, Esq.            Tae Kim, Esq.
Robert Dart, Esq.                Peter Cho, Esq.
Jon Teller, Esq.               Gregory Stuck, Esq.
Sutton A. Shapiro, Esq.         Malalai Anbari, Esq.
Daniel B. Miller, Esq.            Kristen Tojo, Esq.
Hazel Chang, Esq.              Derek Monzon, Esq.
Erik Harper, Esq.               Ryan Medler, Esq.
Johnny Ogata, Esq.               April Yang, Esq.
Daniel DeSantis, Esq.           Rachel Vinson, Esq.

February 1, 2021

*SENT VIA FEDERAL EXPRESS*

**US FERTILITY, LLC**
9600 Blackwell Road, 5th Floor
Rockville, Maryland 20850

Re:   Notice of US Fertility, LLC's Violation of Cal. Civ. Code § 1750 *et seq.*

To Whom It May Concern:

Please allow this correspondence to serve as notice that Defendant US Fertility, LLC ("USF" or "Defendant") is in violation of the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*  In strict compliance with Cal. Civ. Code § 1782(a), Plaintiffs Jennifer Mullinix, Patrisia Vela, and Omar Orozco hereby place Defendant on notice of its alleged violations of Cal. Civ. Code § 1770 and demands that Defendant rectify its practices and procedures.

USF's representations to its customers that it would protect their private identifiable information ("PII") and protected health information ("PHI") in its Privacy Policy were false, misleading, and constitute unfair methods of competition and unlawful, unfair, and fraudulent acts or practices, undertaken by Defendant with the intent to result in the sale of its services to the consuming public.

Plaintiffs and all others similarly situated contracted with USF to receive services from USF's clinics, pursuant to its Privacy Policy and other legal obligations, which formed a part of USF's contracts with its patients and prospective patients under which USF promised to protect its customers' PII and PHI from disclosure.  As evidenced by its November 13, 2020 Notice of Data Breach, USF did not protect its customers' PII from unauthorized disclosure and, instead, allowed it to be accessed and obtained by hackers.

More specifically, Defendant's practices violate California Civil Code § 1770(a) under, *inter alia*, the following subdivisions:

      (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . .

      (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another . . .

(9) Advertising goods or services with intent not to sell them as advertised . . .
(14) Representing that a transaction confers or involves rights, remedies, or obligations that
it does not have or involve, or that are prohibited by law

As detailed in the Complaint, Defendant's practices also constitute a breach of contract; breach of the implied covenant of good faith and fair dealing; negligence per se; negligence; violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*.; violation of the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.150 *et seq*.; violation of the Maryland Consumer Protection Act, Md. Code Comm. Law, § 13-301 *et seq*.; and violation of the Maryland Personal Information Protection Act ("PIPA"), Md. Code Ann., § 14-3501 *et seq*..

While the Complaint constitutes sufficient notice of the claims asserted, pursuant to Cal. Civ. Code § 1782, we hereby demand, on behalf of our clients and all others similarly situated, that Defendant immediately correct and rectify these violations by providing its customers with the level of data privacy and protection that it promises in its Privacy Policy, and compensate its customers for lost property, the significant and continuing risk of property and identity theft, and costs incurred in seeking to mitigate the harm resulting from those risks, which are a direct consequence of Defendant's failure to protect its customers' PII and PHI.

We await your response.

Sincerely,

Thiago M. Coelho, Esq.

cc: Robert Dart, Esq.; April Yang, Esq.

Exhibit J

Thiago M. Coelho, SBN 324715
thiago@wilshirelawfirm.com
Robert J. Dart, SBN 264060
rdart@wilshirelawfirm.com
April Yang, SBN 330951
april@wilshirelawfirm.com
**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Boulevard, 12th Floor
Los Angeles, California 90010
Telephone: (213) 381-9988
Facsimile: (213) 381-9989

*Attorneys for Plaintiffs Jennifer Mullinix, Patrisia Vela,*
*Omar Orozco, and Proposed Class Counsel*

### SUPERIOR COURT FOR THE STATE OF CALIFORNIA

### COUNTY OF ORANGE

| | |
|---|---|
| JENNIFER MULLINIX, PATRISIA VELA, AND OMAR OROZCO, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>US FERTILITY, LLC, a Delaware limited liability company; DOES 1 to 100, inclusive,<br><br>Defendants. | CASE NO.:<br><br>**CLASS ACTION**<br><br>**DECLARATION OF THIAGO M. COELHO PURSUANT TO CALIFORNIA CIVIL CODE § 1780(d)** |

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd. 12th Floor
Los Angeles, CA 90010-1137

DECLARATION OF THIAGO M. COELHO PURSUANT TO
CALIFORNIA CIVIL CODE § 1780(d)

## DECLARATION OF THIAGO M. COELHO

I, Thiago M. Coelho, hereby declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California.  I am an associate at Wilshire Law Firm and counsel of record for Plaintiffs in the above-entitled action.

2.      Defendant US Fertility, LLC has done and is doing business in the County of Orange in California.  Such business includes providing healthcare services to patients through the fertility clinics within its vast network, including the collection of patients' private identifiable information ("PII") and protected health information ("PHI").  It is this collection of patients' PII and PHI, and Defendant's negligent protection thereof,  that resulted in the data breach that is the subject of this lawsuit.

3.      Venue is appropriate in the County of Orange under Sections 395 and 395.5 of the California Code of Civil Procedure because, among other things: (a) Defendant contracted with Plaintiffs and Class Members to perform a contractual obligation – the provision of fertility health services – in the County of Orange; and (b) many of the acts and omissions, and any evidence thereof, that give rise to the claims for relief alleged in this action took place in the County of Orange.

I declare, under penalty of perjury, under the laws of the State of California that the foregoing is true and correct.

Executed this 1st day of February 2021, in Los Angeles, California.

/s/ *Thiago M. Coelho*

Thiago M. Coelho, Esq.
Attorney for Plaintiffs

DECLARATION OF THIAGO M. COELHO PURSUANT TO
CALIFORNIA CIVIL CODE § 1780(d)

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010-1137

**CERTIFICATE OF SERVICE**

I, Thiago M. Coelho, hereby certify that on February 1, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail notice list.

/s/ *Thiago M. Coelho*

Thiago M. Coelho, Esq.
Attorney for Plaintiffs

DECLARATION OF THIAGO M. COELHO PURSUANT TO
CALIFORNIA CIVIL CODE § 1780(d)

WILSHIRE LAW FIRM, PLC
3055 Wilshire Blvd, 12ᵗʰ Floor
Los Angeles, CA 90010-1137

Exhibit K

**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Blvd, 12th Floor
Los Angeles, CA 90010
Tel:  (213) 381-9988
Fax: (213) 381-9989
wilshirelawfirm.com



Bobby Saadian, Esq. JD/MBA

| | |
|---|---|
| Colin M. Jones, Esq. | Nicol Hajjar, Esq. |
| Ilyas Akbari, Esq. | Thiago Coelho, Esq. |
| Gail Richardson, Esq. | Vy Nguyen, Esq. |
| Justin F. Marquez, Esq. | Tae Kim, Esq. |
| Robert Dart, Esq. | Peter Cho, Esq. |
| Jon Teller, Esq. | Gregory Stuck, Esq. |
| Sutton A. Shapiro, Esq. | Malalai Anbari, Esq. |
| Daniel B. Miller, Esq. | Kristen Tojo, Esq. |
| Hazel Chang, Esq. | Derek Monzon, Esq. |
| Erik Harper, Esq. | Ryan Medler, Esq. |
| Johnny Ogata, Esq. | April Yang, Esq. |
| Daniel DeSantis, Esq. | |

February 1, 2021

*SENT VIA FEDERAL EXPRESS*

**US FERTILITY, LLC**
9600 Blackwell Road, 5th Floor
Rockville, Maryland 20850

Re:     Notice of US Fertility, LLC's Violation of Cal. Civ. Code § 1798.150 *et seq*.

To Whom It May Concern:

Please allow this correspondence to serve as notice that you are in violation of CCPA § 1798.150 and CCPA § 1798.82.  In strict compliance with CCAP § 1798.150, you are allowed thirty (30) days to cure this violation, as well as expressly provide that no further violations will occur.  As explained in CCPA § 1798.150, a consumer has the following right subsequent to this notice being provided:

> (a) (1) Any consumer whose nonencrypted or nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following:
> (A) To recover damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.
> (B) Injunctive or declaratory relief.
> (C) Any other relief the court deems proper.

If a cure is not provided, along with written notice that such violation will no longer occur, by **March 3, 2021**, we will have no option but to file a class action complaint to remedy this situation on behalf of those affected.  If you wish to discuss this further, please so advise me and we can set up a telephone call at a convenient time for all parties.  Thank you for your time and attention to this matter.

Sincerely,

Thiago M. Coelho, Esq.
cc: Robert Dart, Esq.; April Yang, Esq.

1